RAÚL DE LOS RÍOS CARMONA, demandante, recurrido y recurrente, *v.* XIOMARA MELÉNDEZ ROSA, demandada, recurrente y recurrida.

*Número:* RE-95-20          *Resuelto:* 28 de junio de 1996

*Joyce Arleen Pagán Nieves*, abogada de la recurrente y recurrida; *Donato Rivera De Jesús*, abogado del recurrido y recurrente; *Roberto Rodríguez Hernández*, Cónsul General de México en San Juan, en calidad de *amicus curiae*.

— o —

Opinión de conformidad emitida por el Juez Presidente Señor Andréu García, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Nuestro compromiso, como integrantes de la Rama Judicial, de contribuir a erradicar de nuestra sociedad el problema de la violencia doméstica nos obliga a emitir esta opinión de conformidad; toda vez que en la sentencia recurrida se soslaya dicho problema, el cual es subyacente a la controversia que nos ocupa. Precisamente, la presencia de dicha circunstancia en este caso constituye el fundamento para reconocer que estamos ante dos (2) de las limitadas excepciones a la aplicación de la Convención de La Haya sobre Aspectos Civiles del Secuestro Internacional de Niños (en adelante la Convención). Nos explicamos.

## I

En el Art. 13 de la Convención, 51 (Núm. 58) Fed. Reg. 10,499 (1986), se proveen unas excepciones al retorno de un menor a su residencia habitual. Cuando se prueba una de las situaciones que se mencionan a continuación, el Estado requerido no estará obligado a ordenar el retorno del niño:

1. El reclamante no estaba realmente ejerciendo los derechos de custodia o había consentido a la remoción (Art.13(a) de la Convención, 51 Fed. Reg. 10,499 (1986)).

2. *La devolución del niño lo expondría a un grave daño físico o sicológico, o pondría de otra forma al niño en una situación intolerable* (Art. 13(b), *supra*).

3. Un niño de suficiente edad y grado de madurez objete su devolución (Art. 13(b), *supra*)

4. La devolución del niño sería contraria a los principios fundamentales de los derechos humanos y de las libertades reconocidas por el Estado contratante donde el niño esté ubicado al presente (Art. 20, *supra*, pág. 10,500).(¹)

En el Art. 17 de la Convención, *supra*, se especifica que el hecho de que se haya emitido una decisión sobre la custodia en el Estado requerido o que esté sujeta a ser reconocida por éste, no debe constituir un fundamento para rehusar la emisión de la orden de retorno del menor. Sin embargo, en el citado artículo se indica con claridad que el foro judicial puede tomar en consideración las razones para tal decisión cuando esté aplicando la Convención.(²)

---

(¹) El Art. 20 de de la Convención de La Haya sobre los Aspectos Civiles del Secuestro Internacional de Niños (en adelante la Convención) dispone lo siguiente: "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." 51 (Núm. 58) Fed. Reg. 10,500 (1986), según citado en *International Child Abductons: A Guide to Applying the 1988 Hague Convention, with Forms,* Chicago, 1989, pág. 26.

(²) El Art. 17 de la Convención, *supra*, dispone lo siguiente: "The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, *but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.*" (Énfasis suplido.)

Según la ley habilitadora de la Convención en Estados Unidos, se exige que la parte que se oponga a la devolución del menor establezca la excepción, tanto del Art. 13(b) como del Art. 20, mediante una evidencia clara y convincente. 42 U.S.C. sec. 11603(e)(2)A). Sin duda, según este *onus probandi,* la interpretación que los tribunales han dado a las excepciones al retorno del menor bajo la Convención es restrictiva.

En torno a la interpretación de las excepciones de la Convención, en un informe explicativo se señala lo siguiente:

... 25. It is thus legitimate to assert that the two objects of the Convention— the one preventive, the other designed to secure the immediate reintegration of the child into its habitual environment —both correspond to a specific idea of what constitutes the "best interests of the child". However, *even when viewing from this perspective, it has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained. For the most part, these exceptions are only concrete illustrations of the overly vague principle whereby the interests of the child are stated to be the guiding criterion in this area.* ...
29. ... paragraphs 1b and 2 of the said article 13 contain exceptions which clearly derive from a consideration of the interests of the child. Now, as we pointed out above, the Convention invests this notion with definite content. Thus, *the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.* (Énfasis suplido.) E. Pérez-Vera, *Explanatory Report of the Hague Convention on the Civil Aspects of International Child Abduction,* Madrid, 1981, págs. 432 y 433.

Según hemos señalado, además del riesgo de un grave daño físico o psicológico o de exponer al menor a una situación intolerable, la Convención provee como una excepción

adicional a la devolución del menor, cuando ésta sea contraria a principios fundamentales de los derechos humanos y de las libertades reconocidas por el Estado.

En el informe de Pérez-Vera, *op. cit.*, se explica que la excepción del Art. 20, *supra*, es poco usual en los tratados o las convenciones sobre el derecho internacional privado. En la cita siguiente se explica el origen de esta excepción:

> ... This rule was the result of a compromise between those delegations which favoured, and those which were opposed to, the inclusion in the Convention of a "public policy" clause.
> The inclusion of such a clause was debated at length by the First Commission, under different formulations. Finally, after four votes against inclusion, the Commisssion accepted, by a majority of only one, that an application for the return of a child could be refused, by reference to a reservation which took into account the public policy exception by way of a restrictive formula concerning the laws governing the family and children in the requested State. The reservation provided for was formulated exactly as follows: 'Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the fundamental principles of the law relating to the family and children in the State addressed. The adoption of this text caused a serious breach in the consensus which basically had prevailed up to this point in the Conference proceedings. That is why all the delegations, aware of the fact that a solution commanding wide acceptance had to be found, embarked upon this road which provided the surest guarantee of the success of the Convention. Pérez-Vera, *op. cit.*

El citado informe de Pérez-Vera explica que la adopción de la excepción contenida en el Art. 20 de la Convención, *supra*, representa un intento de conciliar puntos de vista opuestos. A su vez, la referencia en el artículo a unos principios fundamentales de protección de los derechos humanos y las libertades fundamentales está relacionada a un área del derecho donde hay numerosos acuerdos internacionales. Cabe señalarse que en el citado informe se sugiere que para la aplicación de esta excepción, el tribunal (o la autoridad concernida) debe encontrar que existe una contradicción entre el derecho reclamado y los princi-

pios fundamentales protegidos, y que estos principios prohíben el retorno o regreso del menor.

Reconocemos que existe abundante jurisprudencia mediante la cual se ha sostenido la orden de retorno solicitada, frente a las excepciones dispuestas en la Convención. Véanse, por ejemplo: *P.K. and C.K. v. C.K.*, 1 I.R. 250 (1994); *Re E. (A Minor)*, 1 F.L.R. 135 (1989); *Evans v. Evans*, Court of Appeals (Civil Division) Fam. Law 105 (1989); *C. v. C.*, Court of Appeals (Civil Division) 2 All E.R. 465 (1989); *Re R. (A Minor)*, 1 F.L.R. 105 (1992), entre otros.[3] Sin embargo, el hecho de que en la mayoría de los casos resueltos al amparo de la Convención se sostenga la orden de retorno solicitada, no constituye impedimento para que en un caso apropiado un tribunal la deniegue. Para ello se proveen las limitadas excepciones a la orden de retorno en la Convención. Estas excepciones, a pesar de su interpretación restrictiva, realmente constituyen un reconocimiento de la discreción judicial que ha de ejercitarse cuando se presenta una de las excepciones como impedimento al retorno solicitado.

De acuerdo con un informe de 1993, rendido por una comisión especial para la revisión del funcionamiento de la Convención, sólo en Irlanda se había reportado un caso en el que el tribunal se rehusó a emitir la orden de retorno, parcialmente debido al problema de violencia doméstica, el cual se consideró un riesgo psicológico severo para los niños. *Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on Civil Aspects of International Child Abduction* (held 18–21 January 1993) en 33 (Núm. 1) I. L. M. 227, 241 (1994).

En el caso *A. (M) v. R. (P)*, High Court 1992, Núm. 313

---

[3] Véanse, además, los casos siguientes: *Sánchez Renovales v. Roosa*, Núm. 91-0392232-S, 1991 Conn. Super. Lexis 2215 (1991); *Tahan v. Duquette*, 613 A.2d 486 (1992); *von Glasgow v. von Glasgow*, Sentencia de 15 de septiembre de 1989 (*von Glasgow v. von Glasgow*), 15 Fam. L. Rep. (BNA) 1605–1606; *Korowin v. Korowin*, Sentencia de 13 de febrero de 1992 (*Korowin v. Korowin*), Núm. 138036, Bezirksgericht (Dist. Ct.) des Kanton Horgen (Switz); *C. v. C.*, 2 All E.R. 465 (1988), entre otros.

Sp., 23 July 1992 [unreported],[4] el tribunal en Irlanda resolvió que se probó un riesgo severo de daño sustancial *(weighty risk of substantial harm) ante una situación de violencia doméstica en el hogar*, por lo que se denegó la orden de retorno solicitada. En ese caso, la madre de Y.A.A. se llevó a su hija menor a Irlanda y el padre, de nacionalidad libanesa, solicitó ante los tribunales de Irlanda el retorno de ésta. La madre presentó la excepción del Art. 13(b) de la Convención, *supra*, de manera exitosa. Según expresara el tribunal, ésta logró producir evidencia clara y convincente de la conducta irascible y violenta del padre, en particular la asociada a su consumo de bebidas alcohólicas y a su hábito del juego. Quedó demostrado que la violencia era de tal naturaleza que la madre de la niña había sido sometida a abuso verbal y físico durante un número de años. A su vez, ésta se vio obligada en una ocasión a llamar a la Policía, lo cual generó que fuera amenazada de daño corporal por el padre de la niña, en caso de que volviera a llamar a la Policía. En ese caso, el tribunal aceptó que la madre había huido con su hija por temor a su propia seguridad y la de su hija.

En otro caso, *G.(R) v. G.(B)*, High Court [1992] Núm. 717 Sp, 12 November, 1992 [unreported],[5] se presentó evidencia muy fuerte de los incidentes de violencia hacia los niños cuando el padre estaba bajo los efectos del alcohol. Allí el tribunal aceptó que la madre había dejado el hogar al sentir amenazada su seguridad y la de sus hijos. Al tribunal no le mereció credibilidad la evidencia presentada por el padre que solicitaba el retorno de sus hijos. Concluyó el tribunal que existía un riesgo grave de que los niños fuesen sometidos a daño físico y psicológico.

Ciertamente, de estos dos (2) casos, el primero resulta sumamente relevante a la situación que hoy nos ocupa. El

---

[4] Según citado extensamente en *M.D.P. v. S.M.B.*, (1995) 1 I.L.R.M. 30 (8 de julio de 1994).

[5] Citado también en *M.D.P. v. S.M.B.*, supra.

segundo caso es distinguible por tratarse de incidentes específicos de violencia física contra los niños. Ahora bien, por la íntima relación del problema de violencia doméstica con la excepción discutida en el caso que nos ocupa, repasemos los principios fundamentales en nuestro país sobre el problema de la violencia doméstica.

## II

La política pública del Estado Libre Asociado de Puerto Rico en torno a la violencia doméstica es de repudio enérgico por ser "contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general". 8 L.P.R.A. sec. 601. En el Art. 1.2 de la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, específicamente se reconoce que "la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra sociedad. En el desarrollo de la política sobre este asunto, debemos dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, particularmente a mujeres y menores para preservar su integridad física y emocional, procurar su seguridad y salvar sus vidas". 8 L.P.R.A. sec. 601.

" 'La violencia es uno de los problemas más serios y alarmantes a que nos enfrentamos hoy en día. Particularmente la violencia contra la mujer en sus distintas manifestaciones y el abuso de menores, los que han ido en aumento en los últimos tiempos'. (Escolio omitido.) *Pueblo v. Esmurria Rosado, 117 D.P.R. 884, 890 (1986)*, voto particular de la Juez Asociada Señora Naveira de Rodón." *Pueblo v. Lacroix Correa*, 127 D.P.R. 557, 564–565 (1990), opinión disidente del Juez Asociado Señor Hernández Denton, a la cual se unió la Juez Asociada Señora Naveira de Rodón. Hoy reiteramos que la violencia contra la mujer continúa

siendo uno de los problemas más serios que confronta nuestra sociedad.

La violencia en cualquiera de sus manifestaciones —en particular la violencia doméstica— no debe ser soslayada en situaciones como la presente por encontrarnos con un problema *jurídico que requiere la aplicación de un tratado internacional*. La propia comunidad internacional ha emitido resoluciones y ha suscrito tratados o convenciones que muestran su repudio a este tipo de problema, intentando dar unas soluciones globales a éste. Véanse: *A Declaration on the Elimination of Violence against Women,* Resolución Núm. 48/104 adoptada por la Asamblea General de las Naciones Unidas el 23 de febrero de 1994 (33 (Núm. 4) I.L.M. 1050 (julio 1994), y *Organization of American States: Inter-American Convention on the Prevention, Punishment and Eradication of Violence against Women*, 33 I.L.M. 1534 (1994), entre otros.([6])

En Puerto Rico, tan reciente como en agosto de 1995, la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico rindió su informe, el cual incluye un capítulo sobre el problema de la violencia doméstica. Con respecto a la situación de la mujer que enfrenta este problema, allí se explicó lo siguiente:

> La literatura actual sobre el tema plantea claramente la situación difícil en que se hallan las mujeres: usualmente se les exige que permanezcan en la relación conyugal por el bien de la

---

([6]) En Estados Unidos, mediante resolución (H.R. Con. Res. 172, 101st Cong., 2d Sess; 136 Cong. Rec. H8280 (1990); aprobada por la Cámara y 136 Cong. Rec. S18,252 (1990), aprobada por el Senado), se exhorta a los tribunales estatales a considerar la violencia doméstica en sus determinaciones de custodia. Dicho factor ya está siendo considerado por los tribunales estatales en Estados Unidos. Véanse: J. Pennigton y E. Thomas, *Custody Litigation on Behalf of Battered Women,* (Supl. 1988); L.R. Keenan, *Domestic Violence and Custody Litigation: The Need for Statutory Reform,* 13 Hofstra L. Rev. 407 (1985); N.R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions,* 44 Vand. L. Rev. 1040 (1991). El 13 de septiembre de 1994, el Congreso de Estados Unidos aprobó la Ley de Violencia contra la Mujer *(Violence against Women Act),* 108 Stat. 1902 *et seq.*, la cual, entre otras cosas, asigna fondos a los estados para combatir la violencia contra las mujeres. Con esta legislación federal, el Congreso de Estados Unidos reconoce la gravedad del problema de la violencia doméstica contra las mujeres.

"unidad familiar", que se sacrifique, que sirva de amortiguador de la violencia del hombre, pero si se queda y padece los rigores de esa violencia, entonces pierde credibilidad ante la pregunta de por qué no se fue. El conocimiento de este ciclo[7] es indispensable para entender por qué las mujeres se mantienen en este tipo de relación marcada por la violencia y para ayudarlas a salir de ella ofreciéndoles el respaldo real y efectivo de los componentes del sistema de justicia, de las instituciones dirigidas a su protección y de los profesionales que intervienen en estos casos: médicos, psicólogos, trabajadores y trabajadoras sociales, entre otros.

*Un aspecto adicional de la violencia doméstica que no puede dejar de recalcarse, es el efecto de ésta sobre los hijos e hijas de las parejas que viven inmersas en el problema. Existe una correlación clara entre la violencia doméstica, el maltrato de menores y la delincuencia juvenil. Las estadísticas que comprueban la conexión son tan deprimentes como reveladoras.* En 1988, Boston City Hospital determinó que en el 60 po[r c]iento de los casos de maltrato de menores, la madre también era víctima de maltrato en el hogar. Un estudio del 1985 del Departamento de Servicios a la Juventud de Massachusetts encontró que los menores que se crían en hogares donde se practica la violencia doméstica tienen una mayor probabilidad (74 po[r c]iento más) de cometer crímenes contra la persona y son 26 veces más propensos a cometer una violación sexual.

En Oregón, el 68 po[r c]iento de los jóvenes delincuentes en programas de tratamiento habían presenciado el maltrato recibido por sus respectivas madres o habían sido objeto de maltratos. Sesenta y tres po[r c]iento (63%) de los jóvenes va-

---

(7) El ciclo de la violencia doméstica es descrito minuciosamente en Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, *El Discrimen por Razón de Género en los Tribunales,* State Justice Institute, 1995, págs. 324–326. En resumen, "[e]ste ciclo de maltrato se desarrolla a través de tres (3) fases diferentes. La primera se caracteriza por pequeños incidentes de maltrato que aumentan al pasar del tiempo. La mujer permanece pasiva, aunque trata de controlar o limitar el comportamiento abusivo del opresor. La segunda fase es el incidente de maltrato como tal. Se caracteriza por un acto de violencia en que el agresor pierde el control y la mujer se siente impotente para detener la agresión. La tercera y última fase comienza al cesar la violencia. El agresor siente remordimiento por su comportamiento y ruega por el perdón de su víctima. Al ella perdonarlo, comienza un período de calma. Si se repite este ciclo una segunda vez, se clasifica la mujer como 'maltratada' ". *Pueblo v. González Román,* 129 D.P.R. 933, 949 (1992), opinión concurrente de la Juez Asociada Señora Naveira de Rodón, citando a W.W. Steele y C.W. Sigman, *Reexamining the Doctrine of Self Defense to Accomodate Battered Women,* 18 (Núm. 2) Am. J. Crim. Law 169, 170 (1991). Véase V. Mikesell Mether, *The Skeleton in the Closet: The Battered Woman Syndrome, Self-Defense, and Expert Testimony,* 39 (Núm. 2) Mercer L. Rev. 545, 553 (1988).

rones entre las edades de 11 a 22 años que se encuentran encarcelados por razón de una sentencia de homicidio en los Estados Unidos habían matado al agresor de sus respectivas madres.

Adams, citando a varios importantes autores, señala que "[l]as niñas y los niños expuestos al abuso son más inseguros, más agresivos y más inclinados a deprimirse. Otros estudios indican que estos menores están seis veces más expuestos a intentar el suicidio y a la adicción al alcohol y a las drogas, a escaparse del hogar, involucrarse en prostitución mientras aún son adolescentes y a cometer delitos consistentes en ataques sexuales. De acuerdo con Adams, los estudios indican que el hecho de ser expuesto al abuso de sus madres durante la niñez puede ser un predictor significativo de futuros abusadores de esposas.([8]) (Énfasis suplido y escolios omitidos.) Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, El Discrimen por Razón de Género en los Tribunales, State Justice Institute, 1995, págs. 326–328.

En el mencionado informe se explicó que "[l]a violencia doméstica afecta a los niños cognocitiva, emocional y físicamente. En otras palabras, los niños también son víctimas de ésta, aunque no vaya dirigida directamente a ellos, pues sufren enormemente al presenciar la agresión entre sus padres. Además, los niños aprenden de los padres e imitan su comportamiento: pueden mostrar también una conducta abusiva hacia su madre o imitar el patrón de violencia en sus propias relaciones. El carácter contínuo de la violencia les refuerza la idea de que ésta es aceptable y es parte integral del proceso de convertirse en hombres. Por otro lado, hay riesgo de que los hijos que presencian la violencia contra sus madres sufran problemas psicológicos y

---

([8]) En el texto se citan los autores y las obras que a continuación indicamos: A. Jones, Next Time She'll be Dead, Boston, Beacon Press, 1994, pág. 149; S.M. Buel, Rescuing the Victims of Family Violence, National College of District Attorneys, pág. 4; H. Ackerman, The War Against Women: Overcoming Female Abuse 2, Hazelden Foundation, 1985; D. Adams, Identificando al esposo agresor ante el tribunal, 6 (Núm. 3) Forum 6–8 (1990); D. Kalmuss, The Intergenerational Transmission of Marital Agression, 5 (Núm. 4) J. Marriage & Fam. 11 (1984); G. Hotaling y D. Sugarman, An Analysis of the Risk Markers in Husband to Wife Violence: The Current State of the Knowledge, 2 Violence and Victims 101 (1986); Commonwealth of Massachusetts, Department of Youth and Family Violence, A Study of Abuse and Neglect in the Homes of Serious Juvenile Offenders 17–18 (1985).

*de comportamiento*". (Énfasis suplido.) Comisión Judicial, *supra*, pág. 329.[9]

A su vez, en un manual preparado por la Oficina de Asuntos de la Mujer del Municipio de San Juan se identifican los efectos siguientes sobre los niños:

> Los niños de familias violentas sufren una serie de dificultades y necesidades como resultado de vivir en estas familias disfuncionales. Debido a que no hay cicatrices físicas, el impacto de la violencia en los niños puede pasar desapercibido.
>
> Los niños, como víctimas secundarias, a menudo exhiben una amplia gama de conductas maladaptativas. Estudios indican que los niños que han estado expuestos a incidentes de maltrato conyugal son más propensos a ser ansiosos, deprimidos y/o agresivos. ... Esta conducta va a la par, en gran medida, con el aprendizaje de modelos paternos de conducta pobres y con reacciones al estrés. Los rasgos de personalidad que afectan la habilidad de los niños para funcionar y relacionarse con los demás, también están directamente influenciados por la exposición a la violencia doméstica ....
>
> Las familias que experimentan episodios crónicos de violencia y maltrato usan la violencia y la fuerza física, así como la intimidación emocional, para resolver problemas. Estas familias no facilitan el desarrollo saludable del niño en áreas tales como adaptabilidad y destrezas sociales. Proveen ejemplos pobres de control de impulsos. El mensaje implícito provisto por la conducta de los padres en estas familias es que la violencia o el abuso emocional es la forma de comunicarse y de resolver conflictos[,] opción que estos niños aprenden generalmente a utilizar. Por tal razón, encuentran dificultad para interactuar adecuadamente. Oficina de Asuntos de la Mujer, *Manual sobre Violencia Doméstica*, Municipio de San Juan, págs. 10–11.

Con respecto al efecto de la violencia doméstica sobre las decisiones en los tribunales, en el Informe de la Comisión Especial se explicó lo siguiente:

> ... [E]n sus determinaciones sobre custodia el sistema judicial ha estado ignorando el efecto negativo que la violencia do-

---

[9] En el informe se citan las obras siguientes: L. Walker, *The Battered Woman Syndrome*, 149 (1984); Westra y Martin, *Children of Battered Women*, 10 Maternal Childnursing J. 41 (1981); Jaffe y otros, *Similarities in Behavioral and Social Maladjustment among Child Victims and Witnesses to Family Violence*, 56 Am. J. Orthopsychiatry 142 (1986); Cahn, *supra*, págs. 1055–1058.

méstica ejerce sobre los menores y sobre el comportamiento post-divorcio de los progenitores entre sí y el de cada uno de ellos hacia los hijos e hijas cuando ha habido violencia entre los miembros de la pareja. No se investiga tampoco cómo la violencia doméstica podría afectar las relaciones paterno-materno filiales.

Esta actitud y comportamiento podría llevar incluso a otorgar la custodia al padre victimario o a la madre victimaria, premiando de este modo su conducta agresiva ante los ojos del menor y de la víctima de la violencia doméstica. O podría muy bien concederse la patria potestad conjunta, lo que resultaría necesariamente en un mayor contacto entre el agresor y la víctima. Con ello podría prolongarse la relación de violencia post-divorcio entre las partes. Comisión Judicial, *supra*, pág. 330.

"Conscientes de este grave problema social, nos corresponde el deber ineludible de asegurar que las instituciones judiciales sean instrumentos rápidos y efectivos para vindicar los derechos de las víctimas del maltrato y no un obstáculo adicional que impida que las mujeres recurran al sistema de justicia criminal." *Pueblo v. Lacroix Correa*, supra, pág. 566, opinión disidente del Juez Asociado Señor Hernández Denton, a la cual se unió la Juez Asociada Señora Naveira de Rodón.

El reconocimiento de la magnitud e importancia del problema de la violencia doméstica, y en modo compatible con la política pública imperante en nuestra jurisdicción, nos llevó a admitir el testimonio pericial sobre el síndrome de la mujer maltratada en *Pueblo v. González Román*, 129 D.P.R. 933 (1992). Allí hicimos importantísimas expresiones al efecto.[10]

En su opinión concurrente del citado caso *Pueblo v. González Román*, supra, pág. 948, la Juez Asociada Señora Naveira de Rodón, luego de reconocer los esfuerzos en nuestro país para remediar y proteger a la mujer que sea objeto de

---

[10] En *Pueblo v. González Román,* supra, pág. 942, explicamos que el síndrome de la mujer maltratada "pretende describir una serie de características que resultan comunes en las mujeres que son abusadas, por un período de tiempo prolongado, por su cónyuge o compañero".

violencia doméstica, expresó que "[n]osotros, como Jueces poseedores de la última autoridad en el sistema judicial, *tenemos el deber moral de no abstraernos de la realidad social al interpretar las leyes.* También tenemos que fortalecer la confianza, un tanto perdida, que una víctima de maltrato tiene en las instituciones judiciales". (Énfasis suplido.) Véase también la opinión concurrente y de conformidad emitida por el Juez Asociado Señor Hernández Denton en *Pueblo v. González Román,* supra, pág. 952.

Somos conscientes de que todavía nos falta mucho para lograr una comprensión cabal de la problemática de la violencia doméstica y aumentar la receptividad de los tribunales hacia esta problemática al momento de adjudicar los casos en los cuales esté presente o relacionada ella.[11]

En otra de nuestras opiniones revocamos una resolución del tribunal de instancia al considerar, entre otros aspectos, el problema subyacente de la violencia doméstica. Al rechazar el remedio solicitado por el agresor indicamos lo siguiente:

> ... cabe señalar[se] el efecto disuasivo *(chilling effect)* sobre las víctimas de un acto de violencia doméstica que tiene la resolución que nos ocupa. Además, contraviene la política pública que inspiró la reciente legislación sobre violencia doméstica. 8 L.P.R.A. sec. 601 *et seq.* Sitúa a la víctima ante una encrucijada injusta: si denuncia a su excónyuge-agresor y ello culmina en su encarcelamiento, la deuda alimentaria acumulada durante el encarcelamiento del alimentante eventualmente le será "acreditada". Se premia así indirectamente al agresor, a costa de que la víctima y sus hijos (alimentistas) se vean privados de la pensión que en derecho y en justicia les corresponde. *Rivera Maldonado v. Cabrera Olivera,* 130 D.P.R. 39, 45–46 (1992).

---

[11] Probablemente, una de las áreas de mayor dificultad resulta ser la respuesta a la interrogante de ¿por qué no abandonó antes el hogar? Existen, sin duda, muchísimas razones por las cuales la mujer no sale fácilmente de una situación de violencia doméstica. Las razones principales incluyen: la dependencia, el temor, el estigma social, el hogar, el amor y las presiones psicológicas. Una de las razones más poderosas para que la mujer permanezca en la relación lo es la dependencia física, económica y emocional. Véase D.M. Moore, *Battered Women,* California, Sage Pub., 1979, págs. 20–21.

Otro ejemplo en nuestra jurisdicción de la política pública de repudio hacia la violencia contra la mujer lo constituye la enmienda al Art. 95(d) del Código Penal, 33 L.P.R.A. sec. 4032, para sancionar con mayor rigurosidad dicha conducta criminal. El referido Art. 95(d) es el que dispone que una agresión se considerará agravada cuando se cometa por un varón adulto en la persona de una mujer o un niño. De esta forma se "[r]econoció de esta forma que la violencia del hombre contra la mujer va dirigida a atacar no sólo la integridad personal de la mujer, sino también un ideal social general, el de la igualdad". (Énfasis suplido.) *Pueblo v. Rivera Morales*, 133 D.P.R. 444, 479 (1993), voto particular y de conformidad de la Juez Asociada Señora Naveira de Rodón. La necesidad de una ley especial como la Ley para la Prevención e Intervención con la Violencia Doméstica y su interrelación con el referido Art. 95(d) del Código Penal fue explicado en el citado voto particular y de conformidad de la Juez Asociada Señora Naveira de Rodón, de la forma siguiente:

> ... no podemos cerrar los ojos ante el hecho de que en la actualidad existe una tendencia hacia el aumento en el número de agresiones contra mujeres. Tal realidad fue precisamente la que motivó al legislador a reconocer la necesidad de atender con aun mayor especificidad la modalidad de la agresión contra la mujer conocida como "violencia doméstica". ... Esta modalidad, por sus características muy particulares, exigía un tratamiento especial. La Ley Núm. 54, *supra*, estableció un esquema, civil y criminal, para atender estas circunstancias. Ahora bien, el Art. 1.2 de la Ley Núm. 54, *supra*, 8 L.P.R.A. sec. 601, que recoge la política pública del Estado en este sentido, claramente revela que a pesar de la legislación ir dirigida a penalizar la conducta tanto de hombres como de mujeres, su preocupación primordial fue por las agresiones contra las mujeres y los menores, quienes resultan ser mayormente las víctimas. *Pueblo v. Rivera Morales,* supra, págs. 482–483.

En el Art. 1.2 de la Ley para la Prevención e Intervención con la Violencia Doméstica, *supra,* se señala, en lo pertinente, que ésta "es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones en-

tre hombres y mujeres. Las ideas, actitudes y conductas discriminatorias también permean las instituciones llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados".[12]

Del resumen anterior sobre la ley y nuestra jurisprudencia, en relación con el problema de la violencia doméstica, se colige que el Estado Libre Asociado de Puerto Rico, al ejercer su deber de velar por el bienestar común, *ha elegido atender con carácter prioritario este problema.* Por constituir un problema con una incidencia y prevalencia alarmante que atañe directamente la integridad personal de un amplio sector de nuestra sociedad, ello socava de forma directa el ideal de bienestar general de nuestra sociedad y el ideal de igualdad consagrado en nuestra Constitución. Resulta, pues, un interés apremiante del Estado Libre Asociado de Puerto Rico la protección de las mujeres y los niños en situaciones de violencia doméstica.

## III

Constituye nuestra posición en este caso, que estamos frente a unos hechos que demuestran un grave riesgo de colocar al niño en una situación intolerable, por lo que la orden de retorno tendría el efecto de socavar los principios

---

[12] En el voto particular y de conformidad de la Juez Asociada Señora Naveira de Rodón en *Pueblo v. Rivera Morales,* 133 D.P.R. 444, 485 (1993), se explicó también que "[e]l establecer como firme política pública del Estado el que no se tolerará la agresión contra la mujer, ya sea por conocidos o por desconocidos, tiene el importante efecto de socavar el nocivo proceso de racionalización que a menudo, tanto el ofensor como la sociedad, llevan a cabo para justificar la agresión y que contribuye a perpetuar este mal social. Esta racionalización conduce a excusar ese comportamiento criminal: (1) devaluando a la víctima por considerar que ésta no posee valor alguno en sí misma o por haber actuado en forma que hace que la agresión sea merecida; (2) 'negando a la víctima convencido de que ésta no sufrirá o que es la agresión lo que ésta realmente desea; (3) redefiniendo su conducta no como acto criminal, sino como justiciero o retributivo y (4) considerando injusta la ley que prohíbe o exige la conducta, por lo que se justifica su actuación' ". Citando a O.E. Resumil de Sanfilippo, *Criminología General,* 2da ed., Río Piedras, Ed. U.P.R., 1992, pág. 210.

fundamentales reconocidos en nuestro ordenamiento jurídico. Veamos.

Surge de la sentencia recurrida que las partes se casaron en Puerto Rico y que desde que se casaron han residido en México. El señor de los Ríos nació en California, pero alegadamente ostenta ambas ciudadanías: la mexicana y la norteamericana. La señora Meléndez tiene la ciudadanía norteamericana por haber nacido en Puerto Rico. El niño, nacido en México, ostenta ambas ciudadanías. Al presente cuenta con siete (7) años de edad.

El 11 de noviembre de 1994 el padre, la madre y el niño vinieron a Puerto Rico de vacaciones, con planes de regresar el 14 de noviembre de 1994. El niño había residido en México con sus padres hasta el día de su visita a la Isla.

Toda su vida ha estado bajo el cuidado directo e inmediato de la madre, quien dedicaba todo su tiempo en México al niño y a los quehaceres del hogar. Por su parte, el padre del niño trabaja como sobrecargo o asistente de vuelo en la línea aérea Mexicana de Aviación, por lo que pasa parte del tiempo fuera del hogar. En otras ocasiones éste se ausenta del hogar aunque no esté trabajando. En una ocasión llevó al niño y a la madre a Los Ángeles, California, y los dejó allí durante un mes en la residencia de una hermana de él. En otra ocasión se fue de vacaciones con sus amigos, desatendiendo a su esposa e hijo.

Las partes, conforme lo determinó el tribunal de instancia a base del testimonio de la señora Meléndez, tuvieron un matrimonio feliz hasta hace alrededor de cuatro años y medio (4½), cuando comenzaron los problemas matrimoniales. El tribunal determinó que el germen de la disputa familiar era, según la percepción de la señora Meléndez, que el esposo le era infiel. Ella relató que al regresar de un viaje de Los Ángeles, encontró un retrato de él con otra mujer brindando con una copa de licor en la sala de su hogar, por lo que se sintió "profundamente herida". El señor De Los Ríos negó la infidelidad alegada y adujo que se

trataba de una compañera de trabajo y que estaban presentes otros compañeros en la actividad. Ella no creyó esta versión y le dijo que quería regresar a Puerto Rico con el niño. Alegadamente, él se molestó y le arrebato los pasaportes y otros documentos legales, los cuales mantuvo bajo su control absoluto o el de sus padres o familiares. La señora Meléndez se apoderó de estos documentos en Puerto Rico.

Surge de la sentencia recurrida que desde el mencionado incidente las relaciones matrimoniales siguieron deteriorándose y continuaron las discusiones periódicas, de manera agria, durante las cuales él *"se ponía como una fiera"*. El señor De Los Ríos la amenazaba con quitarle a su hijo y, alegadamente, le decía que en México él tenía el poder económico y prevalecería ante las cortes.

Según el testimonio de la propia perjudicada, ésta sentía temor y se sentía prisionera. La pareja continuó la convivencia. Durante ese tiempo, realizaron otros viajes a Los Ángeles y a Puerto Rico, pero los documentos legales no estaban bajo el control de la señora Meléndez. Por otro lado, ésta tampoco viajaba sola, ya que siempre la acompañaban sus suegros o una hermana de su esposo, quienes controlaban los referidos documentos. El niño siempre la acompañaba. La señora Meléndez nunca le manifestó a sus padres sus problemas matrimoniales.

En la sentencia recurrida se indica que el incidente más violento ocurrió en México, cuando ésta le informó a su esposo que estaba embarazada de nuevo. *En ese momento el la agredió física y verbalmente*. Según determinó el tribunal a base del testimonio de ambas partes, *el altercado fue agrio e hiriente*. Ella narró que *él le gritó, la sujetó por el pelo, la agarró y la empujó contra la pared. Le requirió, además, que viajara a Los Ángeles o a Puerto Rico para que se practicara un aborto.*

El señor De Los Ríos *aceptó la ocurrencia del incidente*, pero negó haberla agredido, a pesar de que manifestó *ha-*

*berse descontrolado* por no creer que fuera posible que le hubieran fallado todos los métodos. En cuanto al aborto, admitió haber desistido de la idea.

El último incidente de discordia en México ocurrió cuando el señor De Los Ríos decidió realizar un viaje de vacaciones con sus amigos, dejándola a ella sola con el niño. La señora Meléndez no estuvo conforme y discutieron. Posteriormente, ella aceptó que él fuera al viaje si luego venían todos a Puerto Rico, como en efecto hicieron.

Durante su estadía en Puerto Rico, la señora Meléndez aprovechó una oportunidad que tuvo y, sin que él se percatara, tomó los pasaportes y otros documentos de ella y del niño. Más tarde, cuando él se percató de esto, se encerró con ella en una habitación de la casa y la increpó. Ella le manifestó que había tomado estos documentos porque se quedaba con el niño en Puerto Rico. *La discusión entre las partes continuó toda la noche*, con la intervención de la madre de ella. *Al día siguiente, la señora Meléndez gestionó y obtuvo una orden de protección bajo la Ley Núm. 54,* supra.

Como parte de la prueba que tuvo ante sí el tribunal, testificó la psicóloga, Dra. Nydia Lucca Irizarry. Ésta le había administrado evaluaciones psicológicas a la madre y al niño y testificó ampliamente sobre ambas evaluaciones. *En su opinión, la señora Meléndez sufre el síndrome de mujer maltratada y el niño estaba en grave riesgo de daño psicológico, y estaría expuesto a una situación intolerable de ordenarse su regreso a México sin su madre.* A través de su representación legal, el señor De Los Ríos tuvo una amplia oportunidad de contrainterrogar a la perito.[13]

El tribunal de instancia determinó que en el caso de

---

[13] A pesar de que en la sentencia recurrida se hacen unos señalamientos sobre las evaluaciones psicológicas, en cuanto a que la psicóloga conocía la controversia entre las partes por haber hecho la evaluación de la madre antes que la del niño, estos señalamientos no son suficientes para restarle credibilidad a éstas. Cabe señalar que las determinaciones de hecho del tribunal de instancia refuerzan la credibilidad de los hallazgos de la perito. Véase la Sentencia de 3 de enero de 1995, págs. 9–10 y 14–15.

autos no había prueba alguna *de maltrato físico* del niño, al igual de que no había prueba de que el traslado del niño a México lo colocara en un grave *riesgo de daño físico*. Sin embargo, el tribunal llegó a la conclusión siguiente:

> ... el Tribunal no tiene duda que *el niño ha sufrido daño sicológico por la situación matrimonial de sus padres, especialmente por las escenas de discusiones frente al niño y el maltrato conyugal de que ha sido víctima la peticionada, por lo ...que sufre de "síndrome de mujer maltratada".* Tampoco tenemos duda que el cuadro de turbulencia de los últimos cuatro años y medio (4 1/2), aproximadamente, unido al regreso del niño a México sin su madre peticionada, quien lo ha cuidado toda la vida, lo pone en *riesgo de daño sicológico.* (Énfasis suplido.) Sentencia de 3 de enero de 1995, pág. 10.

Es importante destacar, además, que el tribunal de instancia reconoció "[c]omo cuestión de hecho y de derecho, [que] *el peticionario incurrió en actos de violencia doméstica contra la peticionada, tanto física como sicológica, en México; y sicológica en Carolina, Puerto Rico".* (Énfasis suplido.) Sentencia, págs. 14–15.

Con respecto a la gravedad del riesgo, el tribunal concluyó que aunque la señora Meléndez *presentó prueba sobre el daño sicológico que sufriría el niño*, ésta no logró establecer que existe un *grave riesgo* de que la restitución del menor lo exponga a un peligro físico y sicológico o que de cualquier otra manera ponga al menor en una situación intolerable.(14) Al final de su dictamen, sin embargo, el foro de instancia hizo las expresiones siguientes sobre la violencia doméstica en el caso de autos:

> ... Ciertamente, en el seno de esta familia ha estado presente la violencia doméstica en todas sus manifestaciones, tanto física como sicológica. [Art. 1.3(k)(1) de la Ley Núm. 54 de 15 de agosto de 1989 (8 L.P.R.A. sec. 602(k)(1))].
>
> No tenemos duda que la conducta observada por el peticionario, en su relación conyugal con la peticionada, constituye un rudo, feo e intolerable azote a la dignidad de su esposa y hace

---

(14) Véase Sentencia de 3 de enero de 1995, pág. 17.

poco menos que imposible la convivencia matrimonial, que tiene que darse en un clima de amor y respeto. ...

. . . . . . .

Este cuadro de violencia doméstica conturba nuestro espíritu y nos impele a repudiarlo. No podríamos estar tranquilos con nuestra conciencia, si así no lo dejáramos consignado en esta Sentencia. Sentencia de 3 de enero de 1995, pág. 19.

Al concluir que no se probó ninguna de las excepciones de la Convención, el tribunal concedió la orden solicitada por el padre, que ordenaba el regreso del menor a México. Sostenemos que erró el tribunal al sopesar el efecto de sus propias determinaciones y, por ende, al ordenar el regreso del menor en este caso.

A la luz de los hechos, conforme éstos fueron determinados por el tribunal de instancia, *indudablemente estamos ante una situación de violencia doméstica*. No se trata sólo de una orden de protección solicitada por la señora Meléndez, sino precisamente del testimonio de ambas partes con respecto a *la violencia existente en su núcleo familiar,* lo que llevó al juzgador de los hechos a determinar con claridad la existencia de este problema en el caso.

Ahora bien, con respecto a la prueba pericial, como tribunal apelativo, estamos en las mismas condiciones que el tribunal de instancia para evaluarla y llegar a nuestras propias conclusiones. Esto constituye una doctrina reiterada en nuestra jurisdicción. Véanse: *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594, 623 (1970); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980); *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993); *Santiago Otero v. Méndez*, 135 D.P.R. 540 (1994); *Hernández Rivera v. Mun. de Bayamón*, 135 D.P.R. 901 (1994), entre otros. Por ello, estudiado cuidadosamente el informe de la psicóloga que evaluó al menor (el cual obra en los autos de

este caso),(¹⁵) concluimos que erró el tribunal al estimar el grado de severidad del riesgo psicológico al cual se enfrentaría el menor de ordenarse su retorno. En lo pertinente, la evaluación psicológica reveló en él fuertes sentimientos de hostilidad, agresividad y ansiedad; *una fuerte dependencia emocional del niño hacia la madre*; temor de perder la seguridad y el afecto que le ofrecen sus padres; proyectó sentimientos de tristeza y tendencias autodestructivas; se proyectó como un niño vulnerable que corre riesgos y peligros; visualiza al varón como el causante de daño a la figura materna; percibe peligro de perder a la madre, en cuyo caso proyectó también el deseo de morirse. En conclusión, dada la vulnerabilidad del niño y sus tendencias depresivas y autodestructivas, *el riesgo que representa su retorno es de una severidad mayor que la apreciada por el tribunal de instancia.* No podemos considerar aisladamente la evaluación psicológica del niño sin ubicar ésta en el contexto de violencia en el hogar; los resultados de ésta en el estado emocional del niño; el miedo causado por la conducta del padre en el niño; el afecto negativo del niño hacia el padre; la dependencia del niño en la madre; la tendencia del padre hacia la violencia; todo ello a la luz de la tierna edad del niño, lo cual ha quedado probado en forma satisfactoria.

En nuestra opinión, *quedó demostrado de forma clara y convincente que, con toda probabilidad, el menor en este caso sería colocado en un grave o severo riesgo de daño psicológico sustancial de ordenarse el retorno a su residen-*

---

(¹⁵) Según la Sec. 6 del *International Child Abduction Remedies Act,* 42 U.S.C. sec. 11605, se permite la consideración de cualquier documento o información relacionada al caso bajo la Convención, sin necesidad de seguir los procedimientos ordinarios para la admisibilidad de evidencia. A esos efectos, allí se dispone lo siguiente: "With respect to any application to the United States Central Authority, or any petition to a court under section 11603 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."

*cia habitual*. Indudablemente, la situación descrita tiene el potencial, *real e inmediato*, de colocar al niño en una situación intolerable, *juzgada al amparo de unos valores sociales reconocidos internacionalmente, dentro de los cuales se enmarca la política pública enérgica y vigorosa de nuestro país*. Conforme a ello, constituye nuestro deber indelegable de velar por la seguridad emocional y física del menor en este caso, ya que nos encontramos ante una de las limitadas excepciones a la aplicación de la Convención. La salud e integridad emocional del menor nos exige denegar su retorno.

Por los fundamentos señalados antes, procede que se revoque la sentencia recurrida y se dicte otra para denegar el retorno del menor.

— o —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se unen los Jueces Asociados Señores Hernández Denton y Corrada Del Río.

I

*Apuntes preliminares*

La *sentencia* de este Tribunal menoscaba la confianza depositada por la comunidad internacional en nuestro sistema de justicia y violenta descarnadamente el espíritu, la esencia y los objetivos que animan la Convención de la Haya sobre los Aspectos Civiles del Secuestro Internacional de Niños (en adelante la Convención). Incursiona precisamente en la práctica que dicho tratado quiso evitar; esto es, entrar sustantivamente en consideraciones de custodia y obviar el derecho natural de los tribunales mexicanos a desarrollar tan importante política pública con respecto a los menores de su suelo. La decisión mayoritaria se muestra nefasta por varias razones.

*Primero*, fundado en una excepción a la regla general del retorno de menores ilegalmente sustraídos o retenidos —visualizada para situaciones extremas de verdadera emergencia— el Tribunal circunvala el tratado y, para todos los efectos prácticos, hace una determinación final y firme de custodia en favor de la madre, *sin tener jurisdicción*.

*Segundo*, la sentencia se presenta impelida por la simpatía natural de este Tribunal hacia la madre (puertorriqueña) y animada por una duda subyacente sobre la capacidad de los tribunales mexicanos para resolver conforme lo que una mayoría de este Tribunal entiende correcto y apropiado. Ese proceder ignora que

> [t]oda decisión en este género de controversia no puede hacerse depender de *las simpatías naturales de los tribunales hacia una de las partes ... como tampoco de temores, fundados o no, de que exclusivamente los foros judiciales puertorriqueños estamos capacitados para resolverlos con absoluta sabiduría, ecuanimidad y juridicidad .... Tampoco es el pronto acceso o primera llegada a la meta en una carrera que uno de los litigantes pueda lograr hacia determinado tribunal, o en la aprehensión de que el traslado temporal de los niños fuera de la jurisdicción entrañe el peligro potencial de que nunca volverán a la custodia de aquel progenitor que la tiene o legalmente debe ostentarla ....* Propiciaría que subsistieran a niveles intolerables las prácticas de secuestro o retención unilateral en detrimento de un sistema uniforme de administrar justicia en pro del bienestar de los menores. (Énfasis suplido.) *Perron v. Corretjer*, 113 D.P.R. 593, 604–605 (1982).

*Tercero*, la mayoría enmarca su dictamen precisamente en el escenario habitual donde se activan las disposiciones generales del convenio. En otras palabras, ante el cuadro general y típico para el que se diseñó el tenor genérico del convenio, invoca con flexibilidad una excepción. Al así actuar, olvida que las disposiciones generales del tratado adquieren virtualidad y *vigencia en el contexto de familias disfuncionales, no normales*. Es precisamente cuando se da la ruptura del vínculo espiritual, anímico y humano que unía a los cónyuges —ruptura que se refleja en las más

variadas desavenencias y discordias, expresadas en distintos grados de frecuencia e intensidad— que de ordinario uno de los cónyuges toma la decisión de sacar al niño de su país de residencia habitual, privando así al otro de su derecho de custodia. No es sorpresivo que en estos casos lamentablemente alguno de los cónyuges haya desplegado algún tipo de conducta maltratante, pues sólo cuando hay amor es cuando de ordinario se da la consideración y el respeto hacia la pareja. Aun ante este cuadro genérico, la Convención establece, *como su objetivo principal*, la devolución del menor a su país de residencia habitual.

*Cuarto*, en consonancia con lo anterior, como toda ruptura matrimonial conlleva ínsitamente el desarrollo de episodios de discordia y de desavenencias entre los cónyuges, que son presenciados por los hijos menores, la siquis de éstos queda profundamente marcada por tales eventos. No es arriesgado aseverar que tales desavenencias tienen que haber alcanzado altos niveles de intensidad —expresados en muchas ocasiones en maltrato o violencia— para que un cónyuge se lleve a los hijos menores fuera del país de residencia habitual. Es lógico, además, que los menores hayan quedado profundamente afectados al observar episodios de maltrato, maledicencia, imprecaciones; en fin, de falta de armonía entre sus padres. Cualquier psicólogo podría afirmar que, ante esos cuadros disfuncionales, la conducta del menor se ha visto ya afectada y deformada. Aún así, ante ese cuadro habitual en que se enmarca la Convención, ésta ordena el retorno del niño al país de residencia habitual.

*Quinto*, la excepción a devolver al niño cuando se encuentre en grave riesgo de daño físico o psicológico, o quede expuesto a sufrir una situación intolerable, está prevista para situaciones en que el retorno pudiera afectar inmediata e inminentemente la seguridad del niño.

*Sexto, el distinguido magistrado de instancia, Hon. Jorge Orama Monroig, tuvo la oportunidad de entrevistar al niño del caso de autos, en privado, y éste expresó su deseo*

*de regresar a México.* Así como hemos concedido validez a las expresiones de un niño que repele la presencia o compañía de uno de los padres, ¿por qué no hacer lo propio, cuando expresa su preferencia? No olvidemos que tal manifestación de la voluntad del menor se ha dado aun en el contexto en que la madre mantiene un alto control afectivo sobre el niño. Es claro, además, que el niño tiene una buena relación con su padre y sus familiares radicados en México.

*Séptimo,* no soslayamos, minimizamos o pasamos por alto el problema de la violencia doméstica y el efecto que pueda tener en los menores. La tenemos muy presente y preocupa sobremanera nuestro ánimo judicial. Ello no obstante, y como bien expresa la sentencia, la violencia conyugal es un factor que debe ser considerado por los tribunales *al adjudicar la custodia.* Como el aspecto de la custodia pertenece a la latitud de los tribunales mexicanos, no nos corresponde adjudicarlo.

*Octavo,* no debe utilizarse como subterfugio la disposición que valida la no devolución del menor, cuando ésta sea contraria a principios fundamentales de los derechos humanos y las libertades reconocidas por el Estado. En este aspecto se señala que, siendo un principio fundamental de derechos humanos del Estado erradicar la violencia doméstica, no procede el retorno. Esa interpretación olvida la esencia de dicha disposición, a saber: cuando la devolución del niño ofenda principios fundamentales de nuestro país, puede el Estado obviar la regla general. Ese no es el caso aquí. La orden de retorno no implica que se haya adjudicado la custodia al padre, sino que se envía al niño al país que está en mejor posición para decidir sobre su custodia. En dicho proceso, el tribunal mexicano competente podrá considerar los episodios de violencia doméstica y tomar la decisión que corresponda. *No podemos investirnos del derecho absoluto de establecer con primacía nuestros principios sobre la violencia doméstica.* Igual preocupación tiene

el ordenamiento mexicano. El mero hecho de devolver el niño a México no valida la violencia doméstica. No se está enviando el niño a un país que incentive una conducta tan reprobable. El mero retorno del niño no vulnera nuestra política pública contra la violencia doméstica.

*Noveno, por respetable que sea, no basta invocar un informe sobre el discrimen por género en nuestros tribunales. No puede sustituirse el tratado por dicho informe.* El Tribunal no ha aducido un solo fundamento que demuestre que México tiene una política pública contraria a la nuestra con respecto a ese mal social y que, por eso, no pueda confiarse en su sistema de administración de justicia. Como todo país civilizado, México posee un sistema jurídico que, tanto en lo penal como en lo civil, censura, castiga y condena la violencia y la agresión. *Dicho sentido natural de rechazo a la violencia no es, pues, de nuestro imperio exclusivo.*

*Décimo,* la vulneración del tratado por la mayoría nos coloca en la peligrosa posición de que, igualmente, no se nos respete en una situación en que se remueva ilícitamente a un menor de nuestra isla. En esas circunstancias podría un tribunal de otro país negarse a retornar al niño, fundamentándose en las mismas interpretaciones forzadas de las excepciones según el tratado.

*Décimoprimero,* afectamos nuestra imagen institucional con decisiones *nacionalistas y chauvinistas* de este tipo. Afrentaron, asimismo, la esfera de latitud en su obrar judicial de tribunales de países amigos. En lugar de adelantar posiciones vanguardistas de respeto a los tratados internacionales y de confianza en la prudencia y mesura de los países signatarios, con nuestra actuación contribuimos a convertir en "letra muerta" importantes convenios internacionales como éste. Contrario a lo que pueda expresar la mayoría, no estamos sacrificando o afectando el bienestar del menor con tal de adelantar esos principios. La comuni-

dad jurídica ha convenido en que el país de residencia habitual es el llamado a hacer tal determinación.

Expongamos primero los hechos y el desarrollo procesal del caso ante nos.

## II

*Hechos y desarrollo procesal*

Xiomara Meléndez Rosa, puertorriqueña, y Raúl De Los Ríos Carmona, nacido en Los Ángeles, California,[1] se casaron en Carolina, Puerto Rico, el 7 de mayo de 1986. Inmediatamente fijaron su residencia en Ciudad de México, D.F.

Procrearon a David De Los Ríos Meléndez, quien nació en Ciudad México, D.F. el 30 de noviembre de 1988[2] y, a la sazón, cuenta con siete (7) años de edad.

El 11 de noviembre de 1994 todos vinieron a Puerto Rico en un viaje de vacaciones.[3] Estando en casa de los padres de la señora Meléndez, ella aprovechó una oportunidad y, sin que su marido se percatara, tomó los pasaportes y otros documentos suyos y del niño. Cuando el señor De Los Ríos se dio cuenta, se encerró en una habitación con ella y le increpó fuertemente, pues ella le expresó que se quedaría con su hijo en Puerto Rico.

Al día siguiente, ella consiguió una orden de protección en el Tribunal de Distrito, Sala de San Juan (Hon. Manuel Soto Cabán, Juez). Esta orden, con vigencia hasta mayo de 1995, prohibía al señor De Los Ríos acercarse al hogar de sus suegros, donde se encontraban su esposa e hijo. No

---

[1] El residió sus primeros doce (12) años en dicho estado. Cuando tenía dieciocho (18) años "juró" la bandera mexicana, pero nunca ha renunciado a la ciudadanía americana.

[2] El niño es ciudadano norteamericano y mexicano.

[3] Los pasajes de regreso eran para el 14 de noviembre de 1994.

obstante haber obtenido una orden a su favor, la esposa le permitió pasar allí esa noche.

La señor Meléndez presentó, además, una demanda de divorcio por trato cruel en el Tribunal Superior, Sala de San Juan.

Así las cosas, el 16 de noviembre de 1994, el señor De Los Ríos presentó ante el Tribunal Superior, Sala de Carolina, una Solicitud de Remedio Urgente bajo Convenio Internacional de la Haya y pidió, en síntesis, que se dejara sin efecto la orden de protección concedida y se le autorizara recoger a su hijo y trasladarlo a México.

La madre del menor se opuso a ello y pidió la desestimación. Alegó, básicamente, que el tratado era inaplicable, ya que el niño no fue sustraído ni retenido de forma ilícita o que infringiera algún derecho de custodia. Contra la alegación específica de retención ilícita, adujo las razones siguientes:

1) La Promovida está actualmente casada legalmente con el Promovente; 2) El matrimonio de las partes se celebró en Puerto Rico; 3) El hijo es producto de ese matrimonio; 4) No existe resolución, orden o decreto judicial de clase alguna que adjudique la custodia del menor a ninguna de las partes en el caso; 5) La madre ha decidido residir permanentemente en Puerto Rico en compañía de su hijo y no regresar a México donde era víctima de maltrato conyugal y estaba sola y desamparada de apoyo alguno; 6) La madre está ejerciendo la custodia natural sobre su hijo menor del que no quiere separarse, ejercer la custodia natural sobre su hijo no constituye un acto ilícito; 7) Separar al menor de la madre sería detrimental para la salud emocional del menor; 8) La madre no tiene recursos económicos para ir a litigar a México[, y] 9) El espíritu del Tratado es proteger a menores de secuestro o sustracciones ilegales o ilícitas por padres *NO* custodios. Moción solicitando desestimación, pág. 3.

En la alternativa de que se considerara aplicable el tratado, la señora Meléndez argumentó la tangencia del Art. 13(b) de la Convención, 51 (Núm. 58) Fed. Reg. 10, 499 (1986), que provee para denegar el traslado del menor cuando lo coloque en una situación de poder sufrir graves

daños físicos o síquicos, o se le exponga a una situación intolerable. Como factores de grave riesgo emocional para el niño, señaló la restricción que sobre su ámbito de acción, alegadamente, le ha impuesto su esposo, al extremo de convertirla en "prisionera" en su propio hogar (le había quitado su pasaporte, licencia de conducir y otros documentos). También las supuestas relaciones extramaritales del marido con sus compañeras de trabajo, ello en menoscabo del bienestar emocional del menor.

Resaltó que el más reciente episodio de maltrato fue cuando descubrió que estaba encinta de nuevo. Su esposo, molesto, la agarró por el pelo y la empujó hacia la pared, a la vez que le exigía que abortara. Consignó que a ello, debido a sus fuertes convicciones cristianas, no accedió.

Luego de varios incidentes procesales, se celebró el juicio. Entre la prueba, se recibió el testimonio pericial de la Dra. Nydia Lucca Irizarry, psicóloga, quien evaluó al niño y a la madre. A tenor de dicha evaluación, opinó que ella sufría el "síndrome de la mujer maltratada" y que el niño, si se ordenara su regreso a México sin su madre, sufriría un "grave riesgo" de daño psicológico y sería expuesto a una "situación intolerable".

Luego de evaluar la prueba, el Tribunal Superior, Sala de Carolina (Hon. Jorge Orama Monroig, Juez), concluyó que el padre del niño ejercía efectivamente sus derechos de custodia —conforme al Art. 414 del Código Civil de México— y que el niño fue removido de su "residencia habitual", por lo que la madre incurrió en una "retención ilegal" según el tratado. Al analizar específicamente las situaciones de excepción al retorno cuando ha mediado una restricción ilegal, puntualizó:

(b) La peticionada invoca vehementemente el artículo 13(b) de la CONVENCION, supra. El mismo recoge el concepto de "grave risk" (grave riesgo o peligro) para el niño DAVID, ya sea físico o psicológico; o colocado en situación intolerable, de ser regresado a México.

Ciertamente, no hay prueba en récord alguno que nos ponga

en condiciones de concluir que existe riesgo o peligro físico para DAVID de ordenarse su regreso a México; *no ya grave, sino ningún riesgo de peligro físico previsible.*

Sin embargo, la peticionaria trajo prueba sobre el daño psicológico que sufriría el niño —DAVID— de ordenarse el regreso, conforme a la CONVENCION.

Si bien es cierto que el testimonio pericial ofrecido por la Dra. Nydia Lucca Irizarry estableció la existencia de serios conflictos matrimoniales entre las partes —que coinciden con prueba directa apreciada por el Tribunal— los cuales se enmarcan dentro del concepto de maltrato conyugal y del "síndrome de mujer maltratada"; sin embargo, no es menos cierto que el testimonio pericial no fue convincente como para establecer que existe un grave riesgo ("grave risk") de que la restitución del menor lo exponga a un peligro físico y psicológico o que de cualquier otra manera ponga al menor en una situación intolerable conforme al dictado de la CONVENCION, Art. 13(b). Sentencia de 3 de enero de 1995, pág. 17.

En virtud de sus conclusiones, ordenó el retorno del niño a Ciudad de México, con su padre.[4]

No conforme, mediante una solicitud de revisión, acudió ante nos la señora Meléndez Rosa el 18 de enero. Caso Núm. RE-95-20. Por su parte, el señor De los Ríos presentó también una revisión el 2 de febrero (Caso Núm. RE-95-50),[5] y el 17 de febrero se opuso a la presentada por la madre del menor. Ésta, a su vez, el 2 junio se opuso al escrito de revisión del padre.

El 10 de mayo, la señora Meléndez informó que, mediante una sentencia en rebeldía de 24 de marzo de 1995, Tribunal Superior, Sala de San Juan (Hon. Yvonne Feliciano de Bonilla, Juez), obtuvo el divorcio a su favor por la

---

[4] La sentencia del reputado Tribunal Superior se registró y archivó en autos el 3 de enero de 1995.

[5] Ordenamos la consolidación de ambos recursos mediante una Resolución de 10 de marzo de 1995 en que además, en auxilio de nuestra jurisdicción, paralizamos la ejecución de la sentencia hasta que resolviéramos conforme a derecho.

Asimismo, mantuvimos la prohibición de remover al menor de la jurisdicción del Estado Libre Asociado —bajo pena de desacato—, dejamos los pasaportes y pasajes de las partes y el niño bajo la custodia de la Secretaria General del Tribunal, y mantuvimos vigente el último plan de relaciones filiales.

causal de trato cruel y la custodia y patria potestad del menor, a la vez que se le impuso al allí demandado Raúl De Los Ríos la suma de cuatrocientos dólares ($400) mensuales en concepto de pensión alimentaria.

Se nos sometió, además, el 23 de mayo un Escrito de los Estados Unidos Mexicanos como Amicus Curiae, con base en la Solicitud de Remedio Urgente bajo el Convenio Internacional de la Haya.([6]) Ese mismo día, el señor De Los Ríos presentó una Moción para que se Tengan Casos por Sometidos. El 26 de mayo presentó, además, su respuesta a la Moción Informativa sobre Divorcio de las Partes y Relaciones Paterno-Filiales.

---

([6]) Entre otras cosas, dicho escrito describe las gestiones efectuadas en México simultáneas a la petición efectuada en Puerto Rico por Raúl bajo el palio de la Convención:

"7.- Paralelamente, el Sr. Manuel de los Ríos, abuelo del menor, inició ante la Consultoría Jurídica de la Secretaría de Relaciones Exteriores un procedimiento de restitución de menor con base en la Convención de la Haya sobre los Aspectos Civiles de la Sustracción de Menores. En el marco de dicho instrumento internacional, se inició el procedimiento de restitución ante la Autoridad Central de los Estados Unidos de América, la Sra. Elizabeth Wadium, a fin de lograr el regreso inmediato del menor a México.

"8.- Del mismo modo, el día 2 de diciembre de 1994, por conducto del despacho de abogados Dávalos, Orta y Asociados S.C., se interpuso otra demanda ante el C. Juez de lo Familiar en turno del Distrito Federal con el objeto de que decretará la restitución inmediata del menor y se notificará a la Sra. Meléndez para que produjera su contestación.

"9.- El pasado 4 de enero de 1995, el Consulado de México en Puerto Rico informó a esta Oficina que el día anterior, el Juez competente decretó la restitución del menor a la Ciudad de México, para cuyo efecto diera a la interesada un plazo de 15 días, contado a partir del 3 de enero, y cuyo cumplimiento tuviera verificado el pasado miércoles 18 de enero.

"10.- Por último, el día 19 de enero, el mismo Consulado nos informó que la Sra. Meléndez interpuso, aún dentro del término, un recurso de revisión ante el Tribunal de Puerto Rico, acto que retrasa una vez más el regreso del menor al territorio nacional.

"11.- En atención a los hechos formulados en los numerales anteriores, es motivo de gran preocupación el hecho de que a la fecha no se hubiese emitido resolución que dirima la litis planteada en el asunto que nos ocupa." Escrito de los Estados Unidos Mexicanos como Amicus Curiae con base en la solicitud de remedio urgente bajo el convenio internacional de La Haya, págs. 2–3.

# III

*Convenio de la Haya: consideraciones generales*

El 25 de octubre de 1980 se aprobó *The Hague Convention on the Civil Aspects of International Child Abduction.*(⁷) Conforme su preámbulo, su propósito principal es "proteger internacionalmente los niños de los efectos dañinos provocados por su remoción o retención ilegal y establecer procedimientos para asegurar su pronta devolución al Estado de su residencia habitual, así como asegurar la protección de derechos de acceso".(⁸) (Traducción nuestra.)

La Convención ha sido definida como procesal y jurisdiccional, pues

... no ofrece parámetros internacionales uniformes para deter-

---

(⁷) Se aprobó en la Décimocuarta Sesión de la Conferencia sobre Derecho Internacional Privado, en Sesión plenaria, por el voto unánime de los veintitrés (23) estados miembros. Ese mismo día, la Convención fue suscrita por Canadá, Francia, Grecia y Suiza. El 23 de diciembre de 1981, se firmó en beneficio de Estados Unidos. El 29 de enero de 1991, México suscribió la Convención.

En 1988, el Congreso de Estados Unidos aprobó legislación habilitadora del tratado —*International Child Abduction Remedies Act (ICARA)*, 42 U.S.C. secs. 11601–11610— haciéndose efectivo el convenio en Estados Unidos el 1ro de julio de 1988.

(⁸) "Las importantes consideraciones encarnadas en la Convención son: la cooperación entre las naciones contratantes a través de sus Autoridades Centrales; los procedimientos rápidos; el cumplimiento con la devolución del niño al padre que tenga el derecho a la custodia de acuerdo con la ley del lugar de su residencia habitual; su carácter no-exclusivo como herramienta contra la sustracción internacional de niños; su protección de los derechos de visita; la disposición sobre la ayuda legal a los extranjeros y nacionales en la medida que sea compatible con lo establecido en la Convención, y su mecánica de disuasión contra el secuestro de niños". (Traducción nuestra y escolio omitido.) M.E. Moraza Choisne, *Juridical Solutions in the U.S.A. for Parental Kidnapping in Child Custody Cases*, 24 (Núm. 2) Rev. Jur. U.I.A. 309, 340 (1990).

Para una discusión de los objetivos de la Convención, véanse: Robin Jo Frank, Nota, *American and International Responses to International Child Abductions*, 16 N.Y.U.J. Int'l L. & Pol. 415 (1984); D.R. Rivers, *The Hague International Child Abduction Convention and The International Child Abduction Remedies Act: Closing Doors to the Parent Abductor*, 2 Transnat'l Law. 589 (1989); B.Ullman Schwerin, *The Hague Convention on International Child Abduction: A Practical Application*, 10 Loy. L.A. Int'l & Comp. L.J. 163 (1988); Comentario, *The Hague Convention on the Civil Aspects of International Child Abduction*, 9 N.C.J. Int'l L. & Com. Reg. 463 (1985); S.B. Blumkin, *La Sustracción Internacional de Menores*, 55 (Núm. 1) Rev. Col. Abo. Buenos Aires 27 (1995).

minar los derechos de custodia ni provee para la ejecución de los decretos de custodia emitidos por otro Estado extranjero. En su lugar, el objetivo de la Convención es desalentar tanto las "sustracciones" ilegales de un niño de un país a otro como las "retenciones" ilegales, proveyendo procedimientos que aseguren que todas las controversias de custodia sean litigadas en la jurisdicción donde el niño era un "residente habitual". Los países que se unen al tratado acuerdan devolver todos los niños sustraídos o retenidos ilegalmente al Estado de su residencia habitual, de modo que las autoridades en ese Estado puedan ejercer el poder de determinar la custodia a largo plazo entre las partes en disputa. (Traducción nuestra y escolios omitidos.) L. Silberman, *Hague International Child Abduction Convention: A Progress Report*, 57 (Núm. 3) Law & Contemp. Probs. 209, 212 (1994). Véase Art. 19, *International Child Abduction Remedies*, 42 U.S.C. sec. 11601(b)(4).

Tanto la Convención como ICARA [*International Child Abduction Remedies Act*, 42 U.S.C. secs. 11601–11610] aseguran que, ausentes las más extremas circunstancias, a un padre no se le permitirá obtener la custodia de un hijo, removiéndolo de su residencia usual a un país o jurisdicción percibido por ese padre como uno más favorablemente inclinado a sus intereses. Véase el Art. 1, Convención; véase también 42 U.S.C. sec. 1160(a)(2). Por lo tanto, todos los países signatarios se han comprometido mutuamente a devolver con prontitud a los niños que sean "sustraídos ilegalmente" dentro del significado de la Convención, a menos que aplique una de las limitadas excepciones establecidas en la Convención. 42 U.S.C. sec. 11601(a)(4).

La Convención e ICARA se han interpretado uniformemente, concediendo a los tribunales del país requerido jurisdicción para determinar los méritos del reclamo de secuestro (*abduction*), pero no los méritos de la controversia subyacente de custodia. *Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6to Cir. 1993). Por consiguiente, mientras este Tribunal pueda apropiadamente determinar qué Estado Contratante tiene jurisdicción para establecer los derechos de custodia de los niños Currier, no podrá asimismo resolver la subyacente disputa de custodia entre los padres. *Levesque v. Levesque*, 816 F. Supp. 662, 663 (D. Kan. 1993). Los tribunales en los países que sean parte de la Convención están obligados a devolver con prontitud los niños al país de "residencia habitual" para la solución de cualesquiera disputas sobre la custodia. *Friederich v. Friedrich*, supra, pág. 1402. Difícilmente los padres quedarán disuadidos de mover a sus hijos a través de los límites internacionales en busca de un foro más simpático, si los tribunales de los países signatarios no

ponen uniformemente en vigor la Convención, en una forma pronta y predecible. (Traducción nuestra.) *Currier v. Currier*, 845 F. Supp. 916, 920 (D. N.H. 1994).

Según la Convención e ICARA, corresponde al peticionario probar, mediante preponderancia de la evidencia, que el menor fue sustraído o retenido de forma ilícita. Art. 12, Convención, 42 U.S.C. sec. 11603(e)(1)(A); *Currier v. Currier*, supra, pág. 920.

El traslado o la retención ilícita se tipifica así en el Art. 3 de la Convención:

> a) cuando se hayan producido con infracción de un derecho de custodia atribuido, separada o conjuntamente, a una persona, a una institución, o a cualquier otro organismo, con arreglo al derecho vigente en el Estado en que el menor tenía su residencia habitual inmediatamente antes de su traslado o retención; y
>
> b) cuando este derecho se ejercía en forma efectiva, separada o conjuntamente, en el momento del traslado o de la retención, o se habría ejercido de no haberse producido dicho traslado o retención.
>
> El derecho de custodia mencionado en a) puede resultar, en particular, de una atribución de pleno derecho, de una decisión judicial o administrativa, o de un acuerdo vigente según el derecho de dicho Estado. DLXII (Núm. 5) *Diario Oficial de la Federación* (Organo del Gobierno Constitucional de los Estados Unidos Mexicanos) de 6 de marzo de 1992, pág. 3; Caso Núm. RE-95-20, Anejo VI, pág. 5.

Una vez un tribunal competente determina que hubo una sustracción o retención ilegal en menoscabo de los derechos de custodia de alguno de los padres, procede la devolución del menor a su país de residencia habitual. ¿Cuál es el tipo de sustracción o retención ilegal ante la cual procede el retorno? Veamos.

"La sustracción o retención tiene que ser ilícita dentro del significado del Art. 3, según aclarado por el Artículo 5(a), de modo que active los procedimientos de retorno establecidos por la Convención." (Traducción nuestra.) *Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 51 Fed. Reg. 10,503, 10,505

(1986), según citado en *International Child Abductions: A Guide to Applying the 1988 Hague Convention, with Forms*, Chicago, ABA, 1989.

¿Cómo se ha interpretado una "sustracción" o "retención" ilícita por la violación de los derechos de custodia?

Linda Silberman delinea muy bien los contornos del problema, ubicándolos en un contexto como el de autos, en que la violación de los derechos de custodia se da previa a un decreto judicial sobre ésta.

> Como hemos visto, un aspecto importante y significativo de la Convención de la Haya —distinto a otros tratados internacionales sobre la custodia de niños— es su aplicación a situaciones predecreto. Muchos secuestros ocurren antes de que se haya comenzado una acción legal formal. Por lo tanto, a las primeras señales de una situación de desintegración familiar, un padre podría decidir llevarse al niño a otro país, particularmente cuando ese padre regresa a su país de origen. En la medida en que los países parecen tratar como conjuntos los derechos de custodia de una pareja, la acción unilateral de una parte, de llevar al niño a otro país o impedir el regreso al lugar de residencia habitual, constituiría una violación de derechos de custodia bajo la Convención. (Traducción nuestra.) Silberman, *supra*, pág. 221.

Según fuera reseñado por Silberman en su artículo, en *Becker v. Becker*,(9) el tribunal determinó que el esposo que había llevado sus hijos en un viaje a Estados Unidos desde el hogar familiar en Australia y se había negado a regresar, los había retenido ilícitamente. La madre de los niños llevó una acción en Nueva Jersey al amparo de la Convención. Solicitó la devolución de los niños y se acogió favorablemente su solicitud de retorno.

En el caso de *Re S.*,(10) una familia israelí tomó un año de sabática en Inglaterra. Para diciembre de 1992, la madre le pidió a su esposo que se fuera de la casa, lo cual él hizo. Se mudó, en enero de 1993, a un lugar cerca de sus

---

(9) 15 Fam. L. Rep. 1605 (1989).

(10) 1 All E.R. 237 (1993).

hijos. En abril de 1993, luego de regresar de una visita a Israel, la esposa se negó a permitir a su marido que hablara con los niños. Cambió incluso el número de teléfono para impedir la comunicación. Ese mismo mes, el esposo comenzó los trámites de divorcio en Israel. En mayo, la esposa obtuvo *ex parte* residencia provisional en Inglaterra. El padre solicitó allí el regreso inmediato de los niños a Israel pues, según alegaba, se le estaban violando sus derechos de custodia. El tribunal determinó que la actuación de la madre constituyó una retención ilícita, máxime ante su declaración jurada en la cual decía que no tenía planes de regresar a Israel y que los hijos tenían su residencia habitual en Inglaterra, aspectos que no había consultado con su esposo. El foro británico resolvió así, no obstante haber regresado el padre a Israel antes del término que había acordado con la madre.

En *Korowin v. Korowin*,[11] un tribunal suizo determinó que la madre había violado los derechos de custodia de su esposo cuando se llevó los niños de Michigan a Suiza y se negó a regresar. El tribunal condenó dicha actuación unilateral de la madre. Encontró irrelevante el hecho de que era ella quien, de facto, daba los cuidados al niño.[12] Silberman, *supra*, pág. 238.

El pensamiento prevaleciente sobre la retención o remoción ilícita violatorio de los derechos de custodia de uno de los padres, queda muy bien resumido en las palabras de la reportera oficial de la Convención de La Haya, Elisa Pérez Vera:[13]

Ahora, desde el punto de vista de la Convención, la sustrac-

---

[11] Sentencia de 13 de febrero 1992 (*Korowin v. Korowin*), Núm. 138036, Bezirksgericht (Dist. Ct.) des Kanton Horgen (Switz).

[12] Para casos sobre decretos de remoción o retención ilegal luego de determinaciones judiciales de custodia o acuerdos de esta índole, véanse: *Navarro v. Bullock*, 15 Fam. L. Rep. (1989); *C. v. C.*, 2 All E.R. 465 (1988); *Tournia v. Mechoulam*, Sentencia de 15 de abril de 1992 (*Tournia v. Mechoulam*), Núm. 1648/92, Isr. Sup. Ct.

[13] Su informe aparece en *Actes et documents de la Quatorziene Session* (1980), Vol. III, Child Abduction.

ción de un niño por uno de los custodios sin el consentimiento del otro es ilícita, y esta ilicitud se deriva en este caso particular, no de alguna acción en violación de una ley específica, sino del hecho de que dicha acción ha hecho caso omiso a los derechos del otro padre que también están protegidos por la ley, y ha interferido con su ejercicio normal. La verdadera naturaleza de la Convención se revela con mayor claridad en estas situaciones: no se ocupa de establecer la persona a la cual corresponderá en algún momento del futuro la custodia del niño, ni de las situaciones en que se pudiera probar la necesidad de modificar una decisión para conceder custodia conjunta a base de hechos que han cambiado posteriormente. Busca, más simplemente, evitar que una decisión posterior en la materia se vea influenciada por un cambio de circunstancias generales a través de alguna actuación unilateral de alguna de las partes. (Traducción nuestra.) *Pérez-Vera Report*, págs. 447–448.

Si aplicamos el precedente marco doctrinario a los hechos del caso, resulta claro que el señor De Los Ríos probó su caso y cumplió con la norma de preponderancia de la evidencia (ICARA, Sec. 4(e)(b)). El señor De Los Ríos y la señora Meléndez, como padres, ejercieron, conforme al citado Art. 414 del Código Civil mexicano, la patria potestad y custodia conjunta sobre David hasta el 11 de noviembre de 1994, cuando llegaron en un viaje de placer a Puerto Rico y ella decidió retener al niño y no regresar a México.

Estos actos claramente infringieron los derechos de custodia del padre.

El propósito deliberado de la señora Meléndez de retener al niño aprovechando el viaje a Puerto Rico surge de su propia Moción Solicitando Desestimación, pág. 4:

La Promovida tenía la intención de regresar a su país natal en compañía de su hijo hace mucho más de un año atrás al enterarse que su esposo le era infiel nuevamente, pero le era imposible salir del país México, porque el Promovente mantenía el *control total* de los documentos de la Promovida y su hijo menor que acreditaban su identidad y ciudadanía americana, sin que la Promovida pudiese tener acceso a los mismos. (Énfasis en el original.)

Precisamente son situaciones como ésta las que la Convención persigue desalentar.

Cada disputa familiar presenta su peculiar y única situación de hechos, y el caso ante nos ciertamente no es diferente. Sin embargo, hay un núcleo central de asuntos a los cuales estaba dirigida la convención de la Haya: situaciones en las que un padre intenta resolver una situación familiar difícil, y obtener ventaja en cualquier posible futuro pleito de custodia, regresando a su país de origen, o país preferido de residencia. (Traducción nuestra.) *Friedrich v. Friedrich*, supra, pág. 1402.

En síntesis, una vez se ha establecido, mediante preponderancia de la evidencia, que la retención de David en Puerto Rico fue ilícita, procede su devolución a su país de residencia habitual (México), a menos que la señora Meléndez haya presentado exitosamente alguna de las excepciones o defensas provistas por la Convención.

## IV

*Excepciones a la restitución del menor (defensas)*

... Esbozadas sucintamente, las excepciones incluyen situaciones en las que: 1) el alegado secuestrador establece que el reclamante no estaba realmente ejerciendo derechos de custodia o que el reclamante había consentido a la sustracción [Art. 13(a)]; 2) la devolución del niño lo expondría a un grave riesgo de daño físico o psicológico o pondría de otra forma al niño en una situación intolerable [Art. 13(b)]; 3) un niño de suficiente edad y grado de madurez objeta su devolución [Art. 13(b)], o 4) la devolución del niño fuera contraria a principios fundamentales de los derechos humanos y las libertades fundamentales reconocidas por el Estado Contratante donde el niño está radicado al presente [Art. 20]. Según la legislación habilitadora de Estados Unidos, una parte que se oponga a la devolución a tenor de las excepciones (2), (3) y (4) tiene la carga de establecer la aplicabilidad de la excepción mediante "evidencia clara y convincente" [42 U.S.C. sec. 11603(e)(2)(A)]. (Traducción nuestra y escolios omitidos.) R.M. Baron, *Child Custody Jurisdiction*, 38 S.D. L. Rev. 479, 493–494 (1993).

## A. *Principio de interpretación restrictiva de las excepciones a la restitución*

De entrada, es menester señalar que las excepciones reconocidas *son de interpretación restrictiva*, de modo que no se menoscaben los principios medulares y esenciales de la Convención, que apuntan hacia el regreso inmediato del menor a su país de "residencia habitual". Así surge prístinamente del reporte Pérez-Vera:

> Parece necesario subrayar el hecho de que los tres tipos de excepción a la regla que ordena la devolución del niño tienen que aplicarse sólo en la medida en que se extiende su significado, y no más allá. Esto implica sobre todo que deben interpretarse en forma restrictiva para que la Convención no se convierta en letra muerta. De hecho, la Convención como un todo descansa en el rechazo unánime de este fenómeno de sustracciones ilegales de niños y en el convencimiento de que la mejor forma de combatirlos a nivel internacional es negándose a concederles reconocimiento legal alguno. La aplicación práctica de este principio requiere que los Estados signatarios se convenzan de que, pese a sus diferencias, pertenecen a la misma comunidad jurídica dentro de la cual las autoridades de cada estado reconocen que las autoridades de uno de ellos —las del sitio de residencia habitual del niño— son en principio las que están en mejor posición de decidir respecto a asuntos de custodia y acceso. Como resultado, una invocación sistemática de dichas excepciones, sustituyendo el foro de residencia del niño por el escogido por el secuestrador, llevaría al colapso de la estructura completa de la Convención, privándole del espíritu de confianza mutua que es su inspiración. (Traducción nuestra.) Pérez-Vera, *op. cit.*, pág. 434. Véanse, además: *Currier v. Currier*, supra, pág. 920.

Es de importancia central limitar el uso de las defensas disponibles —interpretándolas restrictivamente— para hacer viable el éxito de la Convención. "Si los procedimientos según la Convención resultan en la devolución del niño para una determinación de custodia,([14]) las partes se verán

---

([14]) Se ha señalado que "[p]or supuesto, uno de los claros propósitos de la Convención es que la custodia, en sus méritos, se litigue en el Estado de la residencia

alentadas a invocarla. Pero si ciertos Estados contratantes descansaran en las defensas para evitar la devolución, el mecanismo de retorno se vería tronchado. La cooperación internacional se vería frustrada y las partes recurrirían de nuevo a la autoayuda." Silberman, *supra*, pág. 233.

¿Probó la señora Meléndez alguna de las rigurosas y restrictivas excepciones? Veamos.

**B.** *Falta de ejercicio efectivo del peticionario de sus derechos de custodia*

Respecto al Art. 13(a) de la Convención, que dispone como excepciones al retorno la situación que se suscita cuando el padre peticionario no ejercía con efectividad sus derechos de custodia al momento de la sustracción o retención o cuando había dado su consentimiento (aquiescencia), avalamos el enfoque siguiente del Tribunal de Instancia, fundamentado en la prueba dimanante del expediente.

> El Artículo 13(a) de la CONVENCION nos dice que *esta Corte no viene obligada* a retornar al niño —DAVID ANTHONY o DAVID— si el padre no estaba ejerciendo efectivamente sus derechos de custodia o que consintió a su retención por parte de la peticionada. La prueba en récord no nos ha convencido en ninguno de esos extremos. Todo lo contrario, la misma es absolutamente clara en ambos aspectos: (a) el padre ejercía sus derechos de custodia hasta el momento de la retención del niño —cuando la peticionaria le manifestó que no regresaba con él y que retenía al niño con ella, en el domicilio de los padres en Carolina, Puerto Rico—; y (b) él nunca consintió tal retención: trató de dialogar con ella; pasó toda la noche del viernes 11 de noviembre de 1994, dialogando con su suegra (testimonio de él incontrovertido); y radicó la acción que informa el caso de epígrafe. Sentencia de 3 de enero de 1995, pág. 16.

---

habitual del niño, de modo que se obtenga la mejor determinación y se desaliente el secuestro de niños." (Traducción nuestra.) M.E. Moraza Choisne, *supra*, pág. 344.

## C. *Grave riesgo de daño físico o psicológico al menor; exposición a una situación intolerable*

La señora Meléndez argumenta vigorosamente la aplicabilidad del citado Art. 13(b), el cual auspicia que no se ordene el retorno, si se prueba que ello pondría al menor en grave riesgo de sufrir un daño físico o psicológico, o lo coloca en una situación intolerable. Al respecto, la esencia de su defensa es que el alegado maltrato en su contra directamente incidía en el bienestar emocional del niño, pues le creaba un ambiente no propicio para su sano desarrollo.

No podemos dar tan expansiva y abarcadora interpretación a dicha excepción que, como hemos visto, debe interpretarse restrictivamente.

> Este precepto no se diseñó para ser utilizado por los demandados como un vehículo para litigar (o relitigar) los mejores intereses del niño. *Sólo evidencia que establezca directamente la existencia de un grave riesgo que pudiera exponer al menor a un daño físico o emocional o de otra manera lo expusiera a una situación intolerable, es material para la determinación del tribunal.* La persona que se oponga a la devolución del niño tiene que demostrar que el riesgo al niño es grave, no meramente serio.
>
> Un repaso de las deliberaciones de la Convención revela que la "situación intolerable" no se tomó en cuenta para abarcar situaciones en que el retorno a un hogar donde el dinero es escaso, o donde las oportunidades de educación o de otro tipo son más limitadas que en el Estado requerido. Un ejemplo de una "situación intolerable" es cuando un padre custodio abusa sexualmente del niño. Si el otro padre sustrae o retiene al niño para protegerlo de una victimización adicional, y el padre agresor luego solicita bajo la Convención el regreso del niño, el tribunal podría denegar la petición. Dicha acción protegería al niño de ser regresado a una "situación intolerable" y quedar sujeto a un grave riesgo de daño psicológico. (Traducción nuestra.) 51 (Núm. 58) Fed. Reg. 10, 510 (1986).

Por su parte, al comentar dicho artículo, Silberman señala que éste

> ... tiene el potencial de socavar el último objetivo de la Conven-

ción del retorno sumario, abriendo las puertas a la dilucidación en los méritos. Por esta razón, este precepto fue sujeto de mucho debate y negociación durante las deliberaciones de la Convención. Los intentos de ensanchar la excepción fueron resistidos y se rechazó una excepción general de mejores intereses. Muchos tribunales, al interpretar el artículo 13b, han sido cuidadosos en evitar convertirlo en una escapatoria general (*general loophole*). (Traducción nuestra.) L. Silberman, *Hague Convention on International Child Abduction: An Overview and Case Law Analysis*, 28 (Núm. 1) Fam. L. Q. 9, 26 (1994).

En *Sánchez Renovales v. Roosa*,([15]) caso muy similar al de autos, se trataba de una familia que vivía en España. La madre fue a Connecticut con sus hijos a visitar su familia y, una vez allí, telefoneó a su esposo en España y le informó que no tendría que recogerla en el aeropuerto, porque no pensaba regresar. Dijo, además, que sus hijos permanecerían en Connecticut. Solicitó —y se le concedió— una orden de entredicho provisional, presentó una demanda de divorcio y solicitó la custodia temporera de sus hijos. Cuando el esposo solicitó en Connecticut la devolución de los niños a España, la madre presentó la defensa al amparo del Art. 13(b), *supra*. Presentó testimonio pericial de que uno de los hijos sufría de un desorden de tensión post traumático, atribuible parcialmente al comportamiento del padre, quien disciplinaba de manera abusiva al hijo. Le pegaba, además de que lo hacía comer en exceso, lo que le provocaba vómitos en las noches, además de pesadillas. El perito presentado por el padre opinó, por su parte, que había otras razones para la tensión, entre ellas, la enfermedad de la madre —cáncer— y la constante discordia marital. Al rechazar la defensa del Art. 13(b), *supra*, el tribunal determinó que se encontraba ante un padre que amaba a su hijo y quería lo mejor para él. Entendió que el panorama que el caso presentaba era de diferencias cultu-

---

([15]) No. 91-0392232-S, 1991 Conn. Super. Lexis 2215 (Conn. Super. Ct. Sept. 27, 1991).

rales en la crianza de los hijos, que se acentuaban en la medida en que el amor desaparecía de la relación conyugal. El tribunal no consideró en su dictamen el hecho de si era posible para la madre regresar a España con los hijos o si su salud le permitiría regresar con ellos. En su lugar, el tribunal consignó que fue el deseo de la esposa alejarse de España, y que su esposo fue el que dio pie a la tragedia. Subrayó que ella escogió voluntariamente enamorarse, casarse, tener hijos y vivir en España, por lo que debía encarar las consecuencias de su decisión. Expresó no poder condonar la conducta de llevarse los niños fuera de su país de residencia habitual.

En el caso *Tahan v. Duquette*, 613 A.2d 486 (1992), el tribunal puntualizó que de los perfiles psicológicos y la evaluación detallada de aptitud y estilo de vida de alguno de los padres resultaban aspectos inapropiados sobre los cuales había que indagar en una petición de devolución. El tribunal estimó que debía enfocarse en si en la realidad fáctica existía fundamento para los temores concernientes al bienestar del menor al evaluar el ambiente al que el niño sería enviado y las características personales básicas de las personas que estarían junto al menor.

Bajo este cuadro es un hecho indubitado que el ambiente en México ha sido saludable para David en el transcurso de su corta existencia. Aunque la señora Meléndez propugna que el alegado maltrato al que ha estado sujeta por parte de su marido ha afectado al niño negativamente, hemos visto que no es ese el criterio rector, sino la existencia de circunstancias que le perjudiquen directamente. Aparte de su alegación, la promovida recurrente recurrida no ha podido contradecir que David

[e]n Ciudad de México va a la escuela, toma clases de artes marciales (Tae Kwon Do), y además de con su padre y madre, comparte con los amigos y amigas de su vecindario y de sus escuelas, así como con sus abuelos, tíos, primos y otros familiares paternos. Toda su vida gira en torno al grupo e infraestructura de apoyo de la comunidad en que nació y creció. (Escolio

omitido.) Memorándum de derecho en apoyo de la petición presentada, pág. 2.

Es importante puntualizar que no corresponde a este Tribunal —máximo organismo judicial puertorriqueño requerido en el caso de autos— utilizar el citado Art. 13(b) de la Convención como sustituto de determinaciones de los "mejores intereses del menor" que son materia de casos de custodia.(¹⁶) En *Re H* (Eng. C.A. Aug. 20, 1991), el foro apelativo británico revocó una orden de no retornar del tribunal a quo, por entender que incidió al utilizar el Art. 13(b), *supra*, pensando en los efectos a largo plazo del retorno en lugar de considerar el riesgo inmediato al menor de ordenarse la devolución. Silberman, *supra*, pág. 237 esc. 139.

Serán las autoridades judiciales mexicanas quienes dilucidarán en su día si atenta contra los mejores intereses

---

(¹⁶) "Los esfuerzos de bien intencionados salvadores de niños podrían también servir para frustrar los objetivos de la Convención. Ciertamente, es difícil luchar con la retórica acerca de los mejores intereses del niño .... Los intentos para frustrar el retorno según el palio de los mejores intereses, si se les permitiera funcionar con éxito, podrían vulnerar la Convención y transformar su marco procesal en uno de sustancia. En efecto, la Convención presuntamente declara que los mejores intereses del niño se ven en efecto servidos al evitar los secuestros y ordenar el retorno del niño.

"... 'Además, los intentos de servir los mejores intereses de los niños llevando a cabo extensas vistas sobre las defensas de 'daño psicológico' o 'situación intolerable', prolongan los procedimientos y socavan el procedimiento expedito visualizado por la Convención. Es importante cortar dichos intentos. El tribunal de Connecticut en el caso de *Renovales*, aunque rechazó la defensa del artículo 13b, llevó a cabo una extensa vista para determinar si el retorno podía causar daño psicológico al niño. Temiendo repercusiones de un enfoque como ese, el tribunal apelativo en *Tahan* v. *Duquette* intentó limitar el ámbito de las vistas sobre dichas defensas, advirtiendo que controversias sobre los 'méritos' son apropiadas para considerarse en el procedimiento plenario de custodia en el lugar de residencia habitual. En la medida que no debe interferirse con relaciones de facto, es posible, como han ordenado algunos tribunales, que se ordene al padre regresar con el niño y esperar los procedimientos de custodia en el lugar de residencia habitual. Así, cuando se hacen alegaciones de daño serio, un tribunal debe intentar delinear arreglos provisionales, sea con el padre custodio o con terceros, para garantizar la seguridad del niño. Si teme penurias financieras en el retorno, el tribunal podrá requerir pagos para vivienda y manutención durante ese período. Sólo si esas alternativas no estuvieran disponibles, podría el tribunal proceder a una vista de gran escala para determinar si la defensa ha sido sustantivamente establecida por prueba clara y convincente, como se requiere bajo el estatuto federal." (Traducción nuestra.) L. Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis*, 28 (Núm. 1) Fam. L. Q. 9, 32–33 (1994).

de David, para efectos de custodia, el hecho de que su padre Raúl, por motivo de su trabajo, permanezca más de ciento ochenta (180) días fuera de su casa. Asimismo, será labor exclusiva del sistema judicial mexicano aquilatar la gravedad de las desavenencias matrimoniales —específicamente la alegación de Xiomara de que ha estado sujeta a maltrato— a los efectos de decidir si ello convierte al padre en persona inepta para ostentar la custodia de David.([17])

Por nuestra parte, en lo que a nuestra jurisdicción se extiende en el caso de autos, encontramos que si bien el niño puede mostrar huellas en su siquis por las desavenencias entre sus padres, no corre riesgo alguno de grave daño físico o psicológico ni de que vaya a ser colocado en una situación intolerable. Todo lo contrario, su entorno en México, con sus padres, familiares, vecinos y compañeros de escuela como su comunidad habitual, dista mucho de ser atentatorio a su bienestar.

Nótese, pues, que no podemos acoger como criterio rector para exceptuar la devolución de un menor a su país de residencia habitual el hecho de que el progenitor que lo haya sustraído, sea el que de facto le brinda primariamente los cuidados esenciales y básicos.([18])

---

([17]) *von Glasgow v. von Glasgow*, Sentencia de 15 de septiembre de 1989 (*von Glasgow v. von Glasgow*), 15 Fam. L. Rep. (BNA) 1605–06, Bezirksgericht Uster-No. 5689096 u/ERZSVx (Switz). Allí un tribunal suizo, en apelación, revocó el dictamen del tribunal a quo que se negó a ordenar la devolución a Michigan de unos niños sustraídos y llevados por su madre a Suiza. El foro de instancia suizo se había negado a ordenar el regreso de los niños porque la madre se rehusaba a regresar a Estados Unidos, y el reporte de Servicios Sociales determinaba que los niños eran más apegados a la madre y que el regresarlos hubiera resultado en daño psicológico para ellos. Silberman, *supra*, pág. 238.

([18]) Veamos otro caso relacionado con una solicitud de excepción al retorno según el Art. 13(b), a la luz de la consideración del daño al menor por su separación física del padre que le brindaba primariamente sus cuidados.

En *Korowin v. Korowin*, supra, se ordenó el retorno a Michigan de un menor, no empece el argumento de su madre de que habría serio daño psicológico de apartar al niño de ella, ya que era su única cuidadora, y ella no deseaba regresar a Estados Unidos. El tribunal suizo que entendió en el asunto rechazó la defensa del Art. 13(b) e hizo caso omiso de las razones aducidas por la madre para no regresar, esto es, mejores oportunidades en Suiza para conseguir un trabajo y en su procedimiento de divorcio. Resolvió que un demandado tiene que demostrar absoluta incapacidad para regresar con el niño. El tribunal apuntó que no había cortapisas ni complicaciones

En el caso *C. v. C.*, supra, la madre llevó ilícitamente al niño de Australia a Inglaterra. Luego adujo que éste se vería afectado psicológicamente de tener que regresar solo a Australia. Expresó que no podía regresar a Australia porque no tenía dinero ni empleo. El tribunal expresó que un padre no podía descansar en el daño psicológico que previsiblemente podía resultar de su propia negativa a regresar con el niño, pero condicionó su orden a la promesa del padre de proveer ayuda financiera para la madre y el niño en Australia.[19]

Al analizar los hechos del caso ante nos, notamos ciertas similaridades con los casos aquí reseñados.

---

significativas para el retorno de la esposa, quien no venía obligada a regresar con su esposo o regresar a la residencia matrimonial. Enfatizó, además, la receptividad del marido a proveerle una vivienda y sufragar los gastos mientras los procedimientos de custodia en Michigan se desarrollaban. Silberman, *supra*, pág. 238.

[19] A modo ilustrativo, las condiciones impuestas por el foro británico fueron las siguientes:

"(1) [El padre] no tratará de poner en vigor en contra de la madre la orden de tutela y custodia de 10 de agosto de 1988 ni intentará remover a Thomas del cuidado y de la protección de la madre hasta que el Tribunal de Relaciones de Familia de Sydney, Australia, finalmente decida en sus méritos las controversias en torno a la tutela, la custodia, el cuidado y la protección de Thomas. (2) Proveerá de su propio peculio para el uso de la madre de un vehículo de motor adecuado, por un período de dos meses a partir de la fecha de su llegada, o hasta que se decida la controversia, lo que ocurra más tarde. (3) Conseguirá alojamiento sin mobiliario que quede a una distancia razonable de la escuela a la que Thomas asistirá, cuyo alquiler no sea menor de 220 dólares australianos por semana, y la madre pagará el alquiler hasta un límite de 250 dólares australianos por semana. El padre proveerá el mobiliario suficiente y adecuado. (4) Tratará por todos los medios de asegurarle a Thomas acomodo en una escuela primaria de renombre, y costeará todas las cuotas, la ropa y cualquier otro gasto incidental a la educación de Thomas en dicha escuela. (5) Proveerá los pasajes aéreos y reservará los asientos correspondientes, para que Thomas y su madre viajen de Londres a Sydney no antes del 1ro de enero de 1989, y proveerá la cantidad de £50 para cubrir gastos de viaje adicionales. (6) No iniciará ni respaldará voluntariamente ninguna acción para castigar o encarcelar a la madre debido a cualquier desacato al tribunal australiano que ésta haya cometido antes de esta fecha. (7) Se abstendrá de efectuar cualquier gestión que conduzca a la confiscación del pasaporte de la madre, una vez el nombre de Thomas se haya eliminado de dicho pasaporte. (8) Le pasará una pensión alimentaria a Thomas y a su madre desde la fecha cuando éstos lleguen a Australia hasta que se decida el caso, a razón de 650 dólares australianos por semana, pagaderos por adelantado. Si la madre obtuviese un empleo, dicha suma de 650 dólares australianos se reducirá en un 50% del salario que reciba la madre. El pago correspondiente a las primeras cuatro semanas se efectuará al arribo de [Thomas y su madre] a Australia, mientras que el quinto pago y los pagos subsiguientes se harán semanalmente y por adelantado. (9) Pagará todos los gastos médicos en que razonablemente incurra la madre en relación con Thomas en Australia." (Traducción nuestra.) *C. v. C.*, supra, pág. 470.

En su solicitud de desestimación, la señora Meléndez expresó sus preocupaciones en torno a un mandato de retorno, pues ella:

a) No puede ir a México a litigar, no tiene medios de fortuna para esto;

b) No tiene donde vivir en México;

c) No puede trabajar en México para ganarse la vida porque a los extranjeros se les prohíbe trabajar;

d) México resulta un ambiente hostil para la demandada y el sistema judicial de México no ofrece garantías a la demandada de tener un pleito justo e imparcial. Esto ha sido reconocido por el Hon. Ernesto [Zedi]llo, Presidente actual de México en su discurso inaugural al gobierno y a la nación Mexicana en la que señaló como uno de los principales problemas en México, la grave carencia en la impartición de la justicia.

Por lo que el menor estará en México huérfano de la figura más importante en su vida, de quien *siempre* ha estado acompañado. Moción solicitando desestimación, págs. 12–13.

Por nuestra parte, respetamos la latitud de que gozan los tribunales mexicanos en su obrar judicial en asuntos como el de autos. Confiamos en que su decisión final sobre la custodia tendría como horizonte "los mejores intereses del menor", por lo que no es justo vedarles el ejercicio de su poder adjudicativo. No hay fundamento alguno para pensar que los tribunales mexicanos dejarían a la señora Meléndez en estado de indefensión. Nada impide al tribunal mexicano que atienda el caso que nos ocupa proveerle algún remedio, análogo a alguno de los esbozados en los casos aquí reseñados, para que puedan hacerse viables sus oportunidades de litigar en México sin sufrir penurias en el proceso.

C. *Menor con suficiente edad y madurez objeta su restitución*

El Art. 13 de la Convención dispone, en lo pertinente:

La autoridad judicial o administrativa podrá asimismo negarse a ordenar la devolución del menor si comprueba que el propio menor se opone a ésta, cuando el menor haya alcanzado una

edad y un grado de madurez en que resulta apropiado tener en cuenta sus opiniones. (Traducción nuestra.) 51 (Núm. 58) Fed. Reg. 10, 499 (1986).

El juez de instancia, que tuvo la oportunidad de entrevistar al niño, puntualizó:

> Este Magistrado entrevistó al niño DAVID ANTHONY en Cámara, sin la intervención de nadie. El niño me manifestó, como ya lo había dicho la Dra. Lucca, que él prefiere regresar a Mé[x]ico, aún estando consciente que su mamá no regresaría. Lucía bastante sereno. No lo cuestionamos; el propósito era auscultar su sentir y su disposición. Sentencia, pág. 9.

Nos hacemos eco de ese criterio. No hay en el expediente elemento alguno que justificada y razonablemente nos permita alterar esa apreciación, máxime si tomamos en consideración que desde su llegada a Puerto Rico, el niño ha estado bajo el control afectivo de su madre.

D. *La restitución es contraria a los principios fundamentales de derechos humanos y las libertades reconocidas por el Estado requerido*

Como hemos visto, la mayoría aduce prominentemente esta excepción para objetar el retorno de David a México. No obstante, su aplicación parte de una visión distorsionada de la verdadera esencia de la excepción. Esta excepción, contenida en el Art. 20 de la Constitución, *supra*, es conocida como de "política pública". "El enfoque doctrinal es a favor de utilizar sus disposiciones sólo en circunstancias extremas. De acuerdo con el informe de Pérez-Vera, 'para negarse a devolver a un niño a base de este artículo, será necesario demostrar que los principios fundamentales del Estado requerido, con respecto al asunto de la Convención, no lo permiten. Por lo tanto, debe interpretarse como una excepción muy estrecha." (Traducción nuestra.) M.E. Moraza Choisne, *Juridical Solutions in the U.S.A. for Parental Kidnapping in Child Custody Cases*, 24 (Núm. 2) Rev. Jur. U.I.A. 309, 346 (1990).

Por otro lado, se ha dicho que esta excepción se ideó

> ... para ser invocada en la rara ocasión de que el regreso del niño pudiera sacudir la conciencia del tribunal u ofender todas las nociones del debido proceso.... [D]ebe enfatizarse que era la intención que esta excepción, como las otras, se interpretara y aplicara restrictivamente, y no debe usarse, por ejemplo, como vehículo para litigar la custodia en los méritos o para pasar juicio sobre el sistema político del país del cual el niño fue removido. (Traducción nuestra.) Anotación, 51 (Núm. 58) Fed. Reg. 10, 510 (1986).

Por su parte, Silberman ofrece una interpretación más clara e ilustrativa de este artículo. Para su mejor comprensión, distingue el ámbito del Art. 20 del Art. 13(b) citados.

> [E]n *Gsponer v. Johnstone*, un tribunal australiano entendió que el artículo 13b estaba confinado al grave riesgo de daño al niño *dimanante de su regreso a un Estado Contratante particular*. Esta interpretación, aunque útil para limitar el ámbito del Artículo 13b, no parece ser compatible con el enfoque del artículo en 'conducta de otras partes y los intereses de otros niños'. Por otra parte, dicha interpretación parece redundante a la luz de la excepción del artículo 20, excusando el retorno si es incompatible con los principios fundamentales del Estado requerido relacionados con la protección de los derechos humanos y las libertades fundamentales. Así, el artículo 20, no el 13b, está dirigido a preocupaciones acerca de los daños dimanantes del regreso del niño a un país particular. El artículo 20 visualizó una situación limitada donde las preocupaciones de los derechos humanos, usualmente definidas dentro de los parámetros de otros acuerdos internacionales, prohibirían el regreso. (Traducción nuestra.) Silberman, *supra*, págs. 28–29.

Resulta evidente, pues, que este artículo —ideado para situaciones verdaderamente extremas— adquiere su virtualidad cuando el Estado requerido se ve imposibilitado, por la configuración de su ideario de derechos humanos y libertades fundamentales, de enviar al niño a determinado país con unos "mores" y unas escalas valorativas que chocan contra la sensibilidad y el sentido moral del Estado requerido. Esa no es la situación en el caso ante nos. El hecho de que Puerto Rico tenga una clara e importante

política pública contra el abuso conyugal, no riñe con devolver al niño a su país de "residencia habitual", en ausencia de prueba de que México aliente prácticas deleznables de este tipo. Devolver al niño a su país de residencia habitual no implica que inexorablemente quedará inmerso en una turbulenta vorágine de abuso.

V

No podemos aspirar a adjudicarnos el monopolio de la defensa de postulados contra el abuso conyugal y pensar que sería claudicar en ese empeño el enviar al niño a su país. Como hemos visto, México también tiene una importante política contra el abuso conyugal, por lo que no se estaría enviando al niño a un país con valores y morales fundamentalmente distintos en este aspecto. Sería el tribunal mexicano competente el llamado a aquilatar el efecto del abuso conyugal en el bienestar del niño y el papel que juega en la determinación de custodia.

A tenor de lo antes expresado con respecto a los Arts. 20 y 13(b), debemos puntualizar que

[s]in una aplicación cuidadosa o una interpretación restrictiva, estas excepciones podrían ser detrimentales para los propósitos a los cuales la Convención está dirigida. De un lado, las excepciones "podrían tragarse la regla general que requiere el regreso de niños secuestrados" y, de otra parte, podrían "convertir lo que deben ser procedimientos sumarios en vistas adversativas en los méritos, contrario a los propósitos de la Convención".

"Al redactar los Artículos 13 y 20, los representantes de los países que participaron en las negociaciones de la Convención estaban conscientes de que cualesquiera excepciones tenían que configurarse muy estrechamente para que su aplicación no vulnerara los propósitos expresos de la Convención —efectuar el pronto retorno de niños secuestrados—. Más aún, era la creencia general que los tribunales deben atender y cumplir con los objetivos de la Convención interpretando estrechamente la excepciones y permitiendo su uso sólo en casos claramente

meritorios, y sólo cuando la persona que se oponga al retorno haya cumplido con su carga de la prueba. ... Los tribunales retienen la discreción para ordenar se regrese al niño aún si entendieran que aplica una o más de las excepciones." (Traducción nuestra y escolio omitido.) Moraza Choisne, *supra*, pág. 345.

Innegablemente estamos ante un delicado caso revestido de una gran carga emocional. Durante su largo, trabajoso y exhaustivo estudio, en más de una ocasión han aflorado sentimientos muy humanos que nos han hecho meditar si debíamos unirnos a la mayoría en una decisión que, si bien puede ser simpática, violenta los más elementales principios de deferencia y respeto a los tribunales de países amigos con civilizadas culturas jurídicas.

Es evidente el deseo de la mayoría de evitar a toda costa que los tribunales mexicanos puedan hacer una adjudicación de custodia adversa a Meléndez Rosa. Al así hacerlo, pasan por alto el respeto y la confianza mutua que vienen llamados a tener entre sí los países signatarios del convenio internacional bajo consideración en el caso ante nos. Animados por la desconfianza hacia el sistema de justicia mexicano, la mayoría emite un dictamen que vulnera la esencia de tan importante tratado y afecta nuestra imagen en la comunidad jurídica internacional. Siendo ello así, no podemos suscribirlo.